**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 25-7152

MERCURIA ENERGY GROUP LIMITED,

*Petitioner-Appellant,*

*v.*

REPUBLIC OF POLAND,

*Respondent-Appellee.*

_____

*On Appeal from the Decision of the United States District Court
for the District of Columbia in No. 1:23-cv-03572-TNM,
Honorable Trevor Neil McFadden, U.S. District Judge*

## BRIEF FOR PETITIONER-APPELLANT

JAMES E. BERGER
CHARLENE C. SUN
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com

*Counsel for Petitioner-Appellant*

January 21, 2026

CP COUNSEL PRESS    (800) 4-APPEAL • (389572)

# UNCITRAL
# Arbitration Rules
(with new article 1, paragraph 4, as adopted in 2013)

# UNCITRAL
# Rules on Transparency in Treaty-based Investor-State Arbitration





UNITED NATIONS

*Further information may be obtained from:*
UNCITRAL secretariat, Vienna International Centre
P.O. Box 500, 1400 Vienna, Austria

Telephone: (+43-1) 26060-4060   Telefax: (+43-1) 26060-5813
Internet: www.uncitral.org   E-mail: uncitral@uncitral.org

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

# UNCITRAL Arbitration Rules

(with new article 1, paragraph 4,
as adopted in 2013)

# UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration



UNITED NATIONS
New York, 2014

© United Nations: United Nations Commission on International Trade Law. February 2014. All rights reserved worldwide.

This publication has not been formally edited.

Publishing production: English, Publishing and Library Section. United Nations Office at Vienna.

# Contents

*Page*

**General Assembly resolution 68/109**. . . . . . . . . . . . . . .  1

**UNCITRAL Arbitration Rules (with new article 1, paragraph 4, as adopted in 2013)**. . . . . . . . . . . . . . . .  5

**Section I.  Introductory rules**. . . . . . . . . . . . . . . . . . .  5

Scope of application (article 1) . . . . . . . . . . . . . . . . .  5

Notice and calculation of periods of time (article 2)  5

Notice of arbitration (article 3). . . . . . . . . . . . . . . . .  6

Response to the notice of arbitration (article 4) . . . .  7

Representation and assistance (article 5) . . . . . . . . . .  8

Designating and appointing authorities (article 6). . .  8

**Section II.  Composition of the arbitral tribunal** . . .  10

Number of arbitrators (article 7). . . . . . . . . . . . . . . .  10

Appointment of arbitrators (articles 8 to 10). . . . . . .  10

Disclosures by and challenge of arbitrators
  (articles 11 to 13) . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Replacement of an arbitrator (article 14). . . . . . . . . .  13

Repetition of hearings in the event of the
  replacement of an arbitrator (article 15). . . . . . . .  14

Exclusion of liability (article 16) . . . . . . . . . . . . . . .  14

**Section III.  Arbitral proceedings** . . . . . . . . . . . . . . .  15

General provisions (article 17) . . . . . . . . . . . . . . . .  15

Place of arbitration (article 18). . . . . . . . . . . . . . . . .  16

Language (article 19). . . . . . . . . . . . . . . . . . . . . . . . .  16

Statement of claim (article 20) . . . . . . . . . . . . . . . . .  16

Statement of defence (article 21) . . . . . . . . . . . . . . .  17

Amendments to the claim or defence (article 22). . .  18

Pleas as to the jurisdiction of the arbitral tribunal
  (article 23) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Further written statements (article 24) . . . . . . . . . . .  19

Periods of time (article 25). . . . . . . . . . . . . . . . . . . .  19

Interim measures (article 26) . . . . . . . . . . . . . . . . . .  19

Evidence (article 27) . . . . . . . . . . . . . . . . . . . . . . . .  20

|  |  | *Page* |
|---|---|---|
| Hearings (article 28) | . . . . . . . . . . . . . . . . . . . . . . . | 21 |
| Experts appointed by the arbitral tribunal (article 29) | | 21 |
| Default (article 30). | . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| Closure of hearings (article 31) | . . . . . . . . . . . . . . . | 23 |
| Waiver of right to object (article 32) | . . . . . . . . . . . | 23 |

**Section IV.   The award** . . . . . . . . . . . . . . . . . . . . . . . . 24

| Decisions (article 33). | . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| Form and effect of the award (article 34) | . . . . . . . . . | 24 |
| Applicable law, *amiable compositeur* (article 35) | . . . | 25 |
| Settlement or other grounds for termination (article 36) | | 25 |
| Interpretation of the award (article 37) | . . . . . . . . . . . | 26 |
| Correction of the award (article 38). | . . . . . . . . . . . . . | 26 |
| Additional award (article 39) | . . . . . . . . . . . . . . . . . . . | 26 |
| Definition of costs (article 40) | . . . . . . . . . . . . . . . . . . | 27 |
| Fees and expenses of arbitrators (article 41) | . . . . . . . | 27 |
| Allocation of costs (article 42) | . . . . . . . . . . . . . . . . . | 29 |
| Deposit of costs (article 43) | . . . . . . . . . . . . . . . . . . . | 29 |

*Annex* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

| Model arbitration clause for contracts | . . . . . . . . . . . . | 31 |
| Possible waiver statement | . . . . . . . . . . . . . . . . . . . . | 31 |
| Model statements of independence pursuant to | | |
| article 11 of the Rules. | . . . . . . . . . . . . . . . . . . . . . . . | 31 |

**UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration**. . . . . . . . . . . . . . . . . . . . . . . . 33

| Article 1.  Scope of application. | . . . . . . . . . . . . . . . . . . | 33 |
| Applicability of the Rules. | . . . . . . . . . . . . . . . . . . . . | 33 |
| Application of the Rules. | . . . . . . . . . . . . . . . . . . . . . | 33 |
| Discretion and authority of the arbitral tribunal | . . . | 34 |
| Applicable instrument in case of conflict | . . . . . . . . | 34 |
| Application in non-UNCITRAL arbitrations | . . . . . . | 35 |
| Article 2.  Publication of information at the commencement of arbitral proceedings | . . . . . . . . . . . | 35 |
| Article 3.  Publication of documents | . . . . . . . . . . . . . . | 35 |
| Article 4.  Submission by a third person | . . . . . . . . . . . | 36 |
| Article 5.  Submission by a non-disputing Party to the treaty | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 |

*Page*

Article 6.  Hearings ........................... 38

Article 7.  Exceptions to transparency.............. 38

    Confidential or protected information ........... 38

    Integrity of the arbitral process ............... 40

Article 8.  Repository of published information....... 40

# Resolution adopted by the General Assembly on 16 December 2013

*[on the report of the Sixth Committee (A/68/462)]*

## 68/109.   United Nations Commission on International Trade Law Rules on Transparency in Treaty-based Investor-State Arbitration and Arbitration Rules (as revised in 2010, with new article 1, paragraph 4, as adopted in 2013)

*The General Assembly*,

*Recalling* its resolution 2205 (XXI) of 17 December 1966, by which it established the United Nations Commission on International Trade Law with a mandate to further the progressive harmonization and unification of the law of international trade and in that respect to bear in mind the interests of all peoples, in particular those of developing countries, in the extensive development of international trade,

*Recognizing* the value of arbitration as a method of settling disputes that may arise in the context of international relations and the wide use of arbitration for the settlement of treaty-based investor-State disputes,

*Recalling* its resolutions 31/98 of 15 December 1976 and 65/22 of 6 December 2010, in which it recommended the use of the Arbitration Rules of the United Nations Commission on International Trade Law,[1]

*Bearing in mind* that the Arbitration Rules are widely used for the settlement of treaty-based investor-State disputes,

*Recognizing* the need for provisions on transparency in the settlement of such treaty-based investor-State disputes to take account of the public interest involved in such arbitrations,

*Believing* that rules on transparency in treaty-based investor-State arbitration would contribute significantly to the establishment of a harmonized legal framework for a fair and efficient

---

[1] *Official Records of the General Assembly, Thirty-first Session, Supplement No. 17* (A/31/17), chap. V, sect. C; and ibid., *Sixty-fifth Session, Supplement No. 17* (A/65/17), chap. III and annex I.

settlement of international investment disputes, increase transparency and accountability and promote good governance,

*Noting* that the Commission, at its forty-sixth session, adopted the Rules on Transparency in Treaty-based Investor-State Arbitration[2] and amended the Arbitration Rules as revised in 2010 to include, in a new article 1, paragraph 4, a reference to the Rules on Transparency,[3]

*Noting also* that the Rules on Transparency are available for use in investor-State arbitrations initiated under rules other than the Arbitration Rules or in ad hoc proceedings,

*Noting further* that the preparation of the Rules on Transparency was the subject of due deliberation in the Commission and that they benefited from consultations with Governments and interested intergovernmental and international non-governmental organizations,

1. *Expresses its appreciation* to the United Nations Commission on International Trade Law for having prepared and adopted the Rules on Transparency in Treaty-based Investor-State Arbitration[2] and the Arbitration Rules (as revised in 2010, with new article 1, paragraph 4, as adopted in 2013),[3] as annexed to the report of the Commission on the work of its forty-sixth session;[4]

2. *Requests* the Secretary-General to publish, including electronically, and disseminate broadly the text of the Rules on Transparency, both together with the Arbitration Rules (as revised in 2010, with new article 1, paragraph 4, as adopted in 2013) and as a stand-alone text, and to transmit them to Governments and organizations interested in the field of dispute settlement;

3. *Recommends* the use of the Rules on Transparency in relation to the settlement of investment disputes within the scope of their application as defined in article 1 of the Rules, and invites Member States that have chosen to include the Rules in their treaties to inform the Commission accordingly;

4. *Also recommends* that, subject to any provision in relevant treaties that may require a higher degree of transparency

---

[2] Ibid., *Sixty-eighth Session, Supplement No. 17* (A/68/17), chap. III and annex I.

[3] Ibid., chap. III and annex II.

[4] *Official Records of the General Assembly, Sixty-eighth Session, Supplement No. 17* (A/68/17).

than that provided in the Rules on Transparency, the Rules be applied through appropriate mechanisms to investor-State arbitration initiated pursuant to treaties providing for the protection of investors or investments concluded before the date of coming into effect of the Rules, to the extent that such application is consistent with those treaties.

*68th plenary meeting*
*16 December 2013*

# UNCITRAL Arbitration Rules
**(with new article 1, paragraph 4, as revised in 2013)**

## Section I.   Introductory rules

### *Scope of application**

### *Article 1*

1.   Where parties have agreed that disputes between them in respect of a defined legal relationship, whether contractual or not, shall be referred to arbitration under the UNCITRAL Arbitration Rules, then such disputes shall be settled in accordance with these Rules subject to such modification as the parties may agree.

2.   The parties to an arbitration agreement concluded after 15 August 2010 shall be presumed to have referred to the Rules in effect on the date of commencement of the arbitration, unless the parties have agreed to apply a particular version of the Rules. That presumption does not apply where the arbitration agreement has been concluded by accepting after 15 August 2010 an offer made before that date.

3.   These Rules shall govern the arbitration except that where any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the parties cannot derogate, that provision shall prevail.

4.   For investor-State arbitration initiated pursuant to a treaty providing for the protection of investments or investors, these Rules include the UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration ("Rules on Transparency"), subject to article 1 of the Rules on Transparency.

### *Notice and calculation of periods of time*

### *Article 2*

1.   A notice, including a notification, communication or proposal, may be transmitted by any means of communication that provides or allows for a record of its transmission.

---

*A model arbitration clause for contracts can be found in the annex to the Rules.

2.   If an address has been designated by a party specifically for this purpose or authorized by the arbitral tribunal, any notice shall be delivered to that party at that address, and if so delivered shall be deemed to have been received. Delivery by electronic means such as facsimile or e-mail may only be made to an address so designated or authorized.

3.   In the absence of such designation or authorization, a notice is:

*(a)*   Received if it is physically delivered to the addressee; or

*(b)*   Deemed to have been received if it is delivered at the place of business, habitual residence or mailing address of the addressee.

4.   If, after reasonable efforts, delivery cannot be effected in accordance with paragraphs 2 or 3, a notice is deemed to have been received if it is sent to the addressee's last-known place of business, habitual residence or mailing address by registered letter or any other means that provides a record of delivery or of attempted delivery.

5.   A notice shall be deemed to have been received on the day it is delivered in accordance with paragraphs 2, 3 or 4, or attempted to be delivered in accordance with paragraph 4. A notice transmitted by electronic means is deemed to have been received on the day it is sent, except that a notice of arbitration so transmitted is only deemed to have been received on the day when it reaches the addressee's electronic address.

6.   For the purpose of calculating a period of time under these Rules, such period shall begin to run on the day following the day when a notice is received. If the last day of such period is an official holiday or a non-business day at the residence or place of business of the addressee, the period is extended until the first business day which follows. Official holidays or non-business days occurring during the running of the period of time are included in calculating the period.

### *Notice of arbitration*

*Article 3*

1.   The party or parties initiating recourse to arbitration (hereinafter called the "claimant") shall communicate to the other party or parties (hereinafter called the "respondent") a notice of arbitration.

2. Arbitral proceedings shall be deemed to commence on the date on which the notice of arbitration is received by the respondent.

3. The notice of arbitration shall include the following:

*(a)* A demand that the dispute be referred to arbitration;

*(b)* The names and contact details of the parties;

*(c)* Identification of the arbitration agreement that is invoked;

*(d)* Identification of any contract or other legal instrument out of or in relation to which the dispute arises or, in the absence of such contract or instrument, a brief description of the relevant relationship;

*(e)* A brief description of the claim and an indication of the amount involved, if any;

*(f)* The relief or remedy sought;

*(g)* A proposal as to the number of arbitrators, language and place of arbitration, if the parties have not previously agreed thereon.

4. The notice of arbitration may also include:

*(a)* A proposal for the designation of an appointing authority referred to in article 6, paragraph 1;

*(b)* A proposal for the appointment of a sole arbitrator referred to in article 8, paragraph 1;

*(c)* Notification of the appointment of an arbitrator referred to in article 9 or 10.

5. The constitution of the arbitral tribunal shall not be hindered by any controversy with respect to the sufficiency of the notice of arbitration, which shall be finally resolved by the arbitral tribunal.

### *Response to the notice of arbitration*

### *Article 4*

1. Within 30 days of the receipt of the notice of arbitration, the respondent shall communicate to the claimant a response to the notice of arbitration, which shall include:

*(a)* The name and contact details of each respondent;

*(b)* A response to the information set forth in the notice of arbitration, pursuant to article 3, paragraphs 3 *(c)* to *(g).*

2. The response to the notice of arbitration may also include:

*(a)* Any plea that an arbitral tribunal to be constituted under these Rules lacks jurisdiction;

*(b)* A proposal for the designation of an appointing authority referred to in article 6, paragraph 1;

*(c)* A proposal for the appointment of a sole arbitrator referred to in article 8, paragraph 1;

*(d)* Notification of the appointment of an arbitrator referred to in article 9 or 10;

*(e)* A brief description of counterclaims or claims for the purpose of a set-off, if any, including where relevant, an indication of the amounts involved, and the relief or remedy sought;

*(f)* A notice of arbitration in accordance with article 3 in case the respondent formulates a claim against a party to the arbitration agreement other than the claimant.

3. The constitution of the arbitral tribunal shall not be hindered by any controversy with respect to the respondent's failure to communicate a response to the notice of arbitration, or an incomplete or late response to the notice of arbitration, which shall be finally resolved by the arbitral tribunal.

## *Representation and assistance*

### *Article 5*

Each party may be represented or assisted by persons chosen by it. The names and addresses of such persons must be communicated to all parties and to the arbitral tribunal. Such communication must specify whether the appointment is being made for purposes of representation or assistance. Where a person is to act as a representative of a party, the arbitral tribunal, on its own initiative or at the request of any party, may at any time require proof of authority granted to the representative in such a form as the arbitral tribunal may determine.

## *Designating and appointing authorities*

### *Article 6*

1. Unless the parties have already agreed on the choice of an appointing authority, a party may at any time propose the name

or names of one or more institutions or persons, including the Secretary-General of the Permanent Court of Arbitration at The Hague (hereinafter called the "PCA"), one of whom would serve as appointing authority.

2.    If all parties have not agreed on the choice of an appointing authority within 30 days after a proposal made in accordance with paragraph 1 has been received by all other parties, any party may request the Secretary-General of the PCA to designate the appointing authority.

3.    Where these Rules provide for a period of time within which a party must refer a matter to an appointing authority and no appointing authority has been agreed on or designated, the period is suspended from the date on which a party initiates the procedure for agreeing on or designating an appointing authority until the date of such agreement or designation.

4.    Except as referred to in article 41, paragraph 4, if the appointing authority refuses to act, or if it fails to appoint an arbitrator within 30 days after it receives a party's request to do so, fails to act within any other period provided by these Rules, or fails to decide on a challenge to an arbitrator within a reasonable time after receiving a party's request to do so, any party may request the Secretary-General of the PCA to designate a substitute appointing authority.

5.    In exercising their functions under these Rules, the appointing authority and the Secretary-General of the PCA may require from any party and the arbitrators the information they deem necessary and they shall give the parties and, where appropriate, the arbitrators, an opportunity to present their views in any manner they consider appropriate. All such communications to and from the appointing authority and the Secretary-General of the PCA shall also be provided by the sender to all other parties.

6.    When the appointing authority is requested to appoint an arbitrator pursuant to articles 8, 9, 10 or 14, the party making the request shall send to the appointing authority copies of the notice of arbitration and, if it exists, any response to the notice of arbitration.

7.    The appointing authority shall have regard to such considerations as are likely to secure the appointment of an independent and impartial arbitrator and shall take into account the advisability of appointing an arbitrator of a nationality other than the nationalities of the parties.

## Section II. Composition of the arbitral tribunal

*Number of arbitrators*

*Article 7*

1.   If the parties have not previously agreed on the number of arbitrators, and if within 30 days after the receipt by the respondent of the notice of arbitration the parties have not agreed that there shall be only one arbitrator, three arbitrators shall be appointed.

2.   Notwithstanding paragraph 1, if no other parties have responded to a party's proposal to appoint a sole arbitrator within the time limit provided for in paragraph 1 and the party or parties concerned have failed to appoint a second arbitrator in accordance with article 9 or 10, the appointing authority may, at the request of a party, appoint a sole arbitrator pursuant to the procedure provided for in article 8, paragraph 2, if it determines that, in view of the circumstances of the case, this is more appropriate.

*Appointment of arbitrators (articles 8 to 10)*

*Article 8*

1.   If the parties have agreed that a sole arbitrator is to be appointed and if within 30 days after receipt by all other parties of a proposal for the appointment of a sole arbitrator the parties have not reached agreement thereon, a sole arbitrator shall, at the request of a party, be appointed by the appointing authority.

2.   The appointing authority shall appoint the sole arbitrator as promptly as possible. In making the appointment, the appointing authority shall use the following list-procedure, unless the parties agree that the list-procedure should not be used or unless the appointing authority determines in its discretion that the use of the list-procedure is not appropriate for the case:

   *(a)*   The appointing authority shall communicate to each of the parties an identical list containing at least three names;

*(b)* Within 15 days after the receipt of this list, each party may return the list to the appointing authority after having deleted the name or names to which it objects and numbered the remaining names on the list in the order of its preference;

*(c)* After the expiration of the above period of time the appointing authority shall appoint the sole arbitrator from among the names approved on the lists returned to it and in accordance with the order of preference indicated by the parties;

*(d)* If for any reason the appointment cannot be made according to this procedure, the appointing authority may exercise its discretion in appointing the sole arbitrator.

## *Article 9*

1.  If three arbitrators are to be appointed, each party shall appoint one arbitrator. The two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the arbitral tribunal.

2.  If within 30 days after the receipt of a party's notification of the appointment of an arbitrator the other party has not notified the first party of the arbitrator it has appointed, the first party may request the appointing authority to appoint the second arbitrator.

3.  If within 30 days after the appointment of the second arbitrator the two arbitrators have not agreed on the choice of the presiding arbitrator, the presiding arbitrator shall be appointed by the appointing authority in the same way as a sole arbitrator would be appointed under article 8.

## *Article 10*

1.  For the purposes of article 9, paragraph 1, where three arbitrators are to be appointed and there are multiple parties as claimant or as respondent, unless the parties have agreed to another method of appointment of arbitrators, the multiple parties jointly, whether as claimant or as respondent, shall appoint an arbitrator.

2.  If the parties have agreed that the arbitral tribunal is to be composed of a number of arbitrators other than one or three, the arbitrators shall be appointed according to the method agreed upon by the parties.

3.    In the event of any failure to constitute the arbitral tribunal under these Rules, the appointing authority shall, at the request of any party, constitute the arbitral tribunal and, in doing so, may revoke any appointment already made and appoint or reappoint each of the arbitrators and designate one of them as the presiding arbitrator.

### *Disclosures by and challenge of arbitrators\*\* (articles 11 to 13)*

### *Article 11*

When a person is approached in connection with his or her possible appointment as an arbitrator, he or she shall disclose any circumstances likely to give rise to justifiable doubts as to his or her impartiality or independence. An arbitrator, from the time of his or her appointment and throughout the arbitral proceedings, shall without delay disclose any such circumstances to the parties and the other arbitrators unless they have already been informed by him or her of these circumstances.

### *Article 12*

1.    Any arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence.

2.    A party may challenge the arbitrator appointed by it only for reasons of which it becomes aware after the appointment has been made.

3.    In the event that an arbitrator fails to act or in the event of the de jure or de facto impossibility of his or her performing his or her functions, the procedure in respect of the challenge of an arbitrator as provided in article 13 shall apply.

### *Article 13*

1.    A party that intends to challenge an arbitrator shall send notice of its challenge within 15 days after it has been notified

---

\*\*Model statements of independence pursuant to article 11 can be found in the annex to the Rules.

of the appointment of the challenged arbitrator, or within 15 days after the circumstances mentioned in articles 11 and 12 became known to that party.

2.    The notice of challenge shall be communicated to all other parties, to the arbitrator who is challenged and to the other arbitrators. The notice of challenge shall state the reasons for the challenge.

3.    When an arbitrator has been challenged by a party, all parties may agree to the challenge. The arbitrator may also, after the challenge, withdraw from his or her office. In neither case does this imply acceptance of the validity of the grounds for the challenge.

4.    If, within 15 days from the date of the notice of challenge, all parties do not agree to the challenge or the challenged arbitrator does not withdraw, the party making the challenge may elect to pursue it. In that case, within 30 days from the date of the notice of challenge, it shall seek a decision on the challenge by the appointing authority.

### *Replacement of an arbitrator*

*Article 14*

1.    Subject to paragraph 2, in any event where an arbitrator has to be replaced during the course of the arbitral proceedings, a substitute arbitrator shall be appointed or chosen pursuant to the procedure provided for in articles 8 to 11 that was applicable to the appointment or choice of the arbitrator being replaced. This procedure shall apply even if during the process of appointing the arbitrator to be replaced, a party had failed to exercise its right to appoint or to participate in the appointment.

2.    If, at the request of a party, the appointing authority determines that, in view of the exceptional circumstances of the case, it would be justified for a party to be deprived of its right to appoint a substitute arbitrator, the appointing authority may, after giving an opportunity to the parties and the remaining arbitrators to express their views: *(a)* appoint the substitute arbitrator; or *(b)* after the closure of the hearings, authorize the other arbitrators to proceed with the arbitration and make any decision or award.

### *Repetition of hearings in the event of the replacement of an arbitrator*

*Article 15*

If an arbitrator is replaced, the proceedings shall resume at the stage where the arbitrator who was replaced ceased to perform his or her functions, unless the arbitral tribunal decides otherwise.

### *Exclusion of liability*

*Article 16*

Save for intentional wrongdoing, the parties waive, to the fullest extent permitted under the applicable law, any claim against the arbitrators, the appointing authority and any person appointed by the arbitral tribunal based on any act or omission in connection with the arbitration.

# Section III.   Arbitral proceedings

## *General provisions*

### *Article 17*

1.   Subject to these Rules, the arbitral tribunal may conduct the arbitration in such manner as it considers appropriate, provided that the parties are treated with equality and that at an appropriate stage of the proceedings each party is given a reasonable opportunity of presenting its case. The arbitral tribunal, in exercising its discretion, shall conduct the proceedings so as to avoid unnecessary delay and expense and to provide a fair and efficient process for resolving the parties' dispute.

2.   As soon as practicable after its constitution and after inviting the parties to express their views, the arbitral tribunal shall establish the provisional timetable of the arbitration. The arbitral tribunal may, at any time, after inviting the parties to express their views, extend or abridge any period of time prescribed under these Rules or agreed by the parties.

3.   If at an appropriate stage of the proceedings any party so requests, the arbitral tribunal shall hold hearings for the presentation of evidence by witnesses, including expert witnesses, or for oral argument. In the absence of such a request, the arbitral tribunal shall decide whether to hold such hearings or whether the proceedings shall be conducted on the basis of documents and other materials.

4.   All communications to the arbitral tribunal by one party shall be communicated by that party to all other parties. Such communications shall be made at the same time, except as otherwise permitted by the arbitral tribunal if it may do so under applicable law.

5.   The arbitral tribunal may, at the request of any party, allow one or more third persons to be joined in the arbitration as a party provided such person is a party to the arbitration agreement, unless the arbitral tribunal finds, after giving all parties, including the person or persons to be joined, the opportunity to be heard, that joinder should not be permitted

because of prejudice to any of those parties. The arbitral tribunal may make a single award or several awards in respect of all parties so involved in the arbitration.

### *Place of arbitration*

*Article 18*

1.   If the parties have not previously agreed on the place of arbitration, the place of arbitration shall be determined by the arbitral tribunal having regard to the circumstances of the case. The award shall be deemed to have been made at the place of arbitration.

2.   The arbitral tribunal may meet at any location it considers appropriate for deliberations. Unless otherwise agreed by the parties, the arbitral tribunal may also meet at any location it considers appropriate for any other purpose, including hearings.

### *Language*

*Article 19*

1.   Subject to an agreement by the parties, the arbitral tribunal shall, promptly after its appointment, determine the language or languages to be used in the proceedings. This determination shall apply to the statement of claim, the statement of defence, and any further written statements and, if oral hearings take place, to the language or languages to be used in such hearings.

2.   The arbitral tribunal may order that any documents annexed to the statement of claim or statement of defence, and any supplementary documents or exhibits submitted in the course of the proceedings, delivered in their original language, shall be accompanied by a translation into the language or languages agreed upon by the parties or determined by the arbitral tribunal.

### *Statement of claim*

*Article 20*

1.   The claimant shall communicate its statement of claim in writing to the respondent and to each of the arbitrators within

a period of time to be determined by the arbitral tribunal. The claimant may elect to treat its notice of arbitration referred to in article 3 as a statement of claim, provided that the notice of arbitration also complies with the requirements of paragraphs 2 to 4 of this article.

2. The statement of claim shall include the following particulars:

 *(a)* The names and contact details of the parties;

 *(b)* A statement of the facts supporting the claim;

 *(c)* The points at issue;

 *(d)* The relief or remedy sought;

 *(e)* The legal grounds or arguments supporting the claim.

3. A copy of any contract or other legal instrument out of or in relation to which the dispute arises and of the arbitration agreement shall be annexed to the statement of claim.

4. The statement of claim should, as far as possible, be accompanied by all documents and other evidence relied upon by the claimant, or contain references to them.

### *Statement of defence*

*Article 21*

1. The respondent shall communicate its statement of defence in writing to the claimant and to each of the arbitrators within a period of time to be determined by the arbitral tribunal. The respondent may elect to treat its response to the notice of arbitration referred to in article 4 as a statement of defence, provided that the response to the notice of arbitration also complies with the requirements of paragraph 2 of this article.

2. The statement of defence shall reply to the particulars *(b)* to *(e)* of the statement of claim (art. 20, para. 2). The statement of defence should, as far as possible, be accompanied by all documents and other evidence relied upon by the respondent, or contain references to them.

3. In its statement of defence, or at a later stage in the arbitral proceedings if the arbitral tribunal decides that the delay was justified under the circumstances, the respondent may make a counterclaim or rely on a claim for the purpose of a set-off provided that the arbitral tribunal has jurisdiction over it.

4.  The provisions of article 20, paragraphs 2 to 4, shall apply to a counterclaim, a claim under article 4, paragraph 2 *(f)*, and a claim relied on for the purpose of a set-off.

### *Amendments to the claim or defence*

### *Article 22*

During the course of the arbitral proceedings, a party may amend or supplement its claim or defence, including a counterclaim or a claim for the purpose of a set-off, unless the arbitral tribunal considers it inappropriate to allow such amendment or supplement having regard to the delay in making it or prejudice to other parties or any other circumstances. However, a claim or defence, including a counterclaim or a claim for the purpose of a set-off, may not be amended or supplemented in such a manner that the amended or supplemented claim or defence falls outside the jurisdiction of the arbitral tribunal.

### *Pleas as to the jurisdiction of the arbitral tribunal*

### *Article 23*

1.  The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause that forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null shall not entail automatically the invalidity of the arbitration clause.

2.  A plea that the arbitral tribunal does not have jurisdiction shall be raised no later than in the statement of defence or, with respect to a counterclaim or a claim for the purpose of a set-off, in the reply to the counterclaim or to the claim for the purpose of a set-off. A party is not precluded from raising such a plea by the fact that it has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitral proceedings. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

3. The arbitral tribunal may rule on a plea referred to in paragraph 2 either as a preliminary question or in an award on the merits. The arbitral tribunal may continue the arbitral proceedings and make an award, notwithstanding any pending challenge to its jurisdiction before a court.

### *Further written statements*

### *Article 24*

The arbitral tribunal shall decide which further written statements, in addition to the statement of claim and the statement of defence, shall be required from the parties or may be presented by them and shall fix the periods of time for communicating such statements.

### *Periods of time*

### *Article 25*

The periods of time fixed by the arbitral tribunal for the communication of written statements (including the statement of claim and statement of defence) should not exceed 45 days. However, the arbitral tribunal may extend the time limits if it concludes that an extension is justified.

### *Interim measures*

### *Article 26*

1. The arbitral tribunal may, at the request of a party, grant interim measures.

2. An interim measure is any temporary measure by which, at any time prior to the issuance of the award by which the dispute is finally decided, the arbitral tribunal orders a party, for example and without limitation, to:

   *(a)* Maintain or restore the status quo pending determination of the dispute;

   *(b)* Take action that would prevent, or refrain from taking action that is likely to cause, (i) current or imminent harm or (ii) prejudice to the arbitral process itself;

   *(c)* Provide a means of preserving assets out of which a subsequent award may be satisfied; or

   *(d)* Preserve evidence that may be relevant and material to the resolution of the dispute.

3.    The party requesting an interim measure under paragraphs 2 *(a)* to *(c)* shall satisfy the arbitral tribunal that:

*(a)*  Harm not adequately reparable by an award of damages is likely to result if the measure is not ordered, and such harm substantially outweighs the harm that is likely to result to the party against whom the measure is directed if the measure is granted; and

*(b)*  There is a reasonable possibility that the requesting party will succeed on the merits of the claim. The determination on this possibility shall not affect the discretion of the arbitral tribunal in making any subsequent determination.

4.    With regard to a request for an interim measure under paragraph 2 *(d),* the requirements in paragraphs 3 *(a)* and *(b)* shall apply only to the extent the arbitral tribunal considers appropriate.

5.    The arbitral tribunal may modify, suspend or terminate an interim measure it has granted, upon application of any party or, in exceptional circumstances and upon prior notice to the parties, on the arbitral tribunal's own initiative.

6.    The arbitral tribunal may require the party requesting an interim measure to provide appropriate security in connection with the measure.

7.    The arbitral tribunal may require any party promptly to disclose any material change in the circumstances on the basis of which the interim measure was requested or granted.

8.    The party requesting an interim measure may be liable for any costs and damages caused by the measure to any party if the arbitral tribunal later determines that, in the circumstances then prevailing, the measure should not have been granted. The arbitral tribunal may award such costs and damages at any point during the proceedings.

9.    A request for interim measures addressed by any party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of that agreement.

### *Evidence*

*Article 27*

1.    Each party shall have the burden of proving the facts relied on to support its claim or defence.

2.    Witnesses, including expert witnesses, who are presented by the parties to testify to the arbitral tribunal on any issue of fact or expertise may be any individual, notwithstanding that the individual is a party to the arbitration or in any way related to a party. Unless otherwise directed by the arbitral tribunal, statements by witnesses, including expert witnesses, may be presented in writing and signed by them.

3.    At any time during the arbitral proceedings the arbitral tribunal may require the parties to produce documents, exhibits or other evidence within such a period of time as the arbitral tribunal shall determine.

4.    The arbitral tribunal shall determine the admissibility, relevance, materiality and weight of the evidence offered.

### *Hearings*

*Article 28*

1.    In the event of an oral hearing, the arbitral tribunal shall give the parties adequate advance notice of the date, time and place thereof.

2.    Witnesses, including expert witnesses, may be heard under the conditions and examined in the manner set by the arbitral tribunal.

3.    Hearings shall be held in camera unless the parties agree otherwise. The arbitral tribunal may require the retirement of any witness or witnesses, including expert witnesses, during the testimony of such other witnesses, except that a witness, including an expert witness, who is a party to the arbitration shall not, in principle, be asked to retire.

4.    The arbitral tribunal may direct that witnesses, including expert witnesses, be examined through means of telecommunication that do not require their physical presence at the hearing (such as videoconference).

### *Experts appointed by the arbitral tribunal*

*Article 29*

1.    After consultation with the parties, the arbitral tribunal may appoint one or more independent experts to report to it,

in writing, on specific issues to be determined by the arbitral tribunal. A copy of the expert's terms of reference, established by the arbitral tribunal, shall be communicated to the parties.

2. The expert shall, in principle before accepting appointment, submit to the arbitral tribunal and to the parties a description of his or her qualifications and a statement of his or her impartiality and independence. Within the time ordered by the arbitral tribunal, the parties shall inform the arbitral tribunal whether they have any objections as to the expert's qualifications, impartiality or independence. The arbitral tribunal shall decide promptly whether to accept any such objections. After an expert's appointment, a party may object to the expert's qualifications, impartiality or independence only if the objection is for reasons of which the party becomes aware after the appointment has been made. The arbitral tribunal shall decide promptly what, if any, action to take.

3. The parties shall give the expert any relevant information or produce for his or her inspection any relevant documents or goods that he or she may require of them. Any dispute between a party and such expert as to the relevance of the required information or production shall be referred to the arbitral tribunal for decision.

4. Upon receipt of the expert's report, the arbitral tribunal shall communicate a copy of the report to the parties, which shall be given the opportunity to express, in writing, their opinion on the report. A party shall be entitled to examine any document on which the expert has relied in his or her report.

5. At the request of any party, the expert, after delivery of the report, may be heard at a hearing where the parties shall have the opportunity to be present and to interrogate the expert. At this hearing, any party may present expert witnesses in order to testify on the points at issue. The provisions of article 28 shall be applicable to such proceedings.

### *Default*

*Article 30*

1. If, within the period of time fixed by these Rules or the arbitral tribunal, without showing sufficient cause:

*(a)* The claimant has failed to communicate its statement of claim, the arbitral tribunal shall issue an order for the termination of the arbitral proceedings, unless there are remaining

matters that may need to be decided and the arbitral tribunal considers it appropriate to do so;

(b)   The respondent has failed to communicate its response to the notice of arbitration or its statement of defence, the arbitral tribunal shall order that the proceedings continue, without treating such failure in itself as an admission of the claimant's allegations; the provisions of this subparagraph also apply to a claimant's failure to submit a defence to a counterclaim or to a claim for the purpose of a set-off.

2.   If a party, duly notified under these Rules, fails to appear at a hearing, without showing sufficient cause for such failure, the arbitral tribunal may proceed with the arbitration.

3.   If a party, duly invited by the arbitral tribunal to produce documents, exhibits or other evidence, fails to do so within the established period of time, without showing sufficient cause for such failure, the arbitral tribunal may make the award on the evidence before it.

*Closure of hearings*

*Article 31*

1.   The arbitral tribunal may inquire of the parties if they have any further proof to offer or witnesses to be heard or submissions to make and, if there are none, it may declare the hearings closed.

2.   The arbitral tribunal may, if it considers it necessary owing to exceptional circumstances, decide, on its own initiative or upon application of a party, to reopen the hearings at any time before the award is made.

*Waiver of right to object*

*Article 32*

A failure by any party to object promptly to any non-compliance with these Rules or with any requirement of the arbitration agreement shall be deemed to be a waiver of the right of such party to make such an objection, unless such party can show that, under the circumstances, its failure to object was justified.

# Section IV.  The award

## *Decisions*

### *Article 33*

1.    When there is more than one arbitrator, any award or other decision of the arbitral tribunal shall be made by a majority of the arbitrators.

2.    In the case of questions of procedure, when there is no majority or when the arbitral tribunal so authorizes, the presiding arbitrator may decide alone, subject to revision, if any, by the arbitral tribunal.

## *Form and effect of the award*

### *Article 34*

1.    The arbitral tribunal may make separate awards on different issues at different times.

2.    All awards shall be made in writing and shall be final and binding on the parties. The parties shall carry out all awards without delay.

3.    The arbitral tribunal shall state the reasons upon which the award is based, unless the parties have agreed that no reasons are to be given.

4.    An award shall be signed by the arbitrators and it shall contain the date on which the award was made and indicate the place of arbitration. Where there is more than one arbitrator and any of them fails to sign, the award shall state the reason for the absence of the signature.

5.    An award may be made public with the consent of all parties or where and to the extent disclosure is required of a party by legal duty, to protect or pursue a legal right or in relation to legal proceedings before a court or other competent authority.

6.    Copies of the award signed by the arbitrators shall be communicated to the parties by the arbitral tribunal.

### *Applicable law, amiable compositeur*

*Article 35*

1. The arbitral tribunal shall apply the rules of law designated by the parties as applicable to the substance of the dispute. Failing such designation by the parties, the arbitral tribunal shall apply the law which it determines to be appropriate.

2. The arbitral tribunal shall decide as amiable compositeur or ex aequo et bono only if the parties have expressly authorized the arbitral tribunal to do so.

3. In all cases, the arbitral tribunal shall decide in accordance with the terms of the contract, if any, and shall take into account any usage of trade applicable to the transaction.

### *Settlement or other grounds for termination*

*Article 36*

1. If, before the award is made, the parties agree on a settlement of the dispute, the arbitral tribunal shall either issue an order for the termination of the arbitral proceedings or, if requested by the parties and accepted by the arbitral tribunal, record the settlement in the form of an arbitral award on agreed terms. The arbitral tribunal is not obliged to give reasons for such an award.

2. If, before the award is made, the continuation of the arbitral proceedings becomes unnecessary or impossible for any reason not mentioned in paragraph 1, the arbitral tribunal shall inform the parties of its intention to issue an order for the termination of the proceedings. The arbitral tribunal shall have the power to issue such an order unless there are remaining matters that may need to be decided and the arbitral tribunal considers it appropriate to do so.

3. Copies of the order for termination of the arbitral proceedings or of the arbitral award on agreed terms, signed by the arbitrators, shall be communicated by the arbitral tribunal to the parties. Where an arbitral award on agreed terms is made, the provisions of article 34, paragraphs 2, 4 and 5, shall apply.

*Interpretation of the award*

*Article 37*

1. Within 30 days after the receipt of the award, a party, with notice to the other parties, may request that the arbitral tribunal give an interpretation of the award.

2. The interpretation shall be given in writing within 45 days after the receipt of the request. The interpretation shall form part of the award and the provisions of article 34, paragraphs 2 to 6, shall apply.

*Correction of the award*

*Article 38*

1. Within 30 days after the receipt of the award, a party, with notice to the other parties, may request the arbitral tribunal to correct in the award any error in computation, any clerical or typographical error, or any error or omission of a similar nature. If the arbitral tribunal considers that the request is justified, it shall make the correction within 45 days of receipt of the request.

2. The arbitral tribunal may within 30 days after the communication of the award make such corrections on its own initiative.

3. Such corrections shall be in writing and shall form part of the award. The provisions of article 34, paragraphs 2 to 6, shall apply.

*Additional award*

*Article 39*

1. Within 30 days after the receipt of the termination order or the award, a party, with notice to the other parties, may request the arbitral tribunal to make an award or an additional award as to claims presented in the arbitral proceedings but not decided by the arbitral tribunal.

2. If the arbitral tribunal considers the request for an award or additional award to be justified, it shall render or complete its award within 60 days after the receipt of the request. The

arbitral tribunal may extend, if necessary, the period of time within which it shall make the award.

3. When such an award or additional award is made, the provisions of article 34, paragraphs 2 to 6, shall apply.

## *Definition of costs*

### *Article 40*

1. The arbitral tribunal shall fix the costs of arbitration in the final award and, if it deems appropriate, in another decision.

2. The term "costs" includes only:

*(a)* The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 41;

*(b)* The reasonable travel and other expenses incurred by the arbitrators;

*(c)* The reasonable costs of expert advice and of other assistance required by the arbitral tribunal;

*(d)* The reasonable travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;

*(e)* The legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;

*(f)* Any fees and expenses of the appointing authority as well as the fees and expenses of the Secretary-General of the PCA.

3. In relation to interpretation, correction or completion of any award under articles 37 to 39, the arbitral tribunal may charge the costs referred to in paragraphs 2 *(b)* to *(f)*, but no additional fees.

## *Fees and expenses of arbitrators*

### *Article 41*

1. The fees and expenses of the arbitrators shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject matter, the time spent by the arbitrators and any other relevant circumstances of the case.

2. If there is an appointing authority and it applies or has stated that it will apply a schedule or particular method for determining the fees for arbitrators in international cases, the arbitral tribunal in fixing its fees shall take that schedule or method into account to the extent that it considers appropriate in the circumstances of the case.

3. Promptly after its constitution, the arbitral tribunal shall inform the parties as to how it proposes to determine its fees and expenses, including any rates it intends to apply. Within 15 days of receiving that proposal, any party may refer the proposal to the appointing authority for review. If, within 45 days of receipt of such a referral, the appointing authority finds that the proposal of the arbitral tribunal is inconsistent with paragraph 1, it shall make any necessary adjustments thereto, which shall be binding upon the arbitral tribunal.

*4.* *(a)* When informing the parties of the arbitrators' fees and expenses that have been fixed pursuant to article 40, paragraphs 2 *(a)* and *(b)*, the arbitral tribunal shall also explain the manner in which the corresponding amounts have been calculated;

*(b)* Within 15 days of receiving the arbitral tribunal's determination of fees and expenses, any party may refer for review such determination to the appointing authority. If no appointing authority has been agreed upon or designated, or if the appointing authority fails to act within the time specified in these Rules, then the review shall be made by the Secretary-General of the PCA;

*(c)* If the appointing authority or the Secretary-General of the PCA finds that the arbitral tribunal's determination is inconsistent with the arbitral tribunal's proposal (and any adjustment thereto) under paragraph 3 or is otherwise manifestly excessive, it shall, within 45 days of receiving such a referral, make any adjustments to the arbitral tribunal's determination that are necessary to satisfy the criteria in paragraph 1. Any such adjustments shall be binding upon the arbitral tribunal;

*(d)* Any such adjustments shall either be included by the arbitral tribunal in its award or, if the award has already been issued, be implemented in a correction to the award, to which the procedure of article 38, paragraph 3, shall apply.

5. Throughout the procedure under paragraphs 3 and 4, the arbitral tribunal shall proceed with the arbitration, in accordance with article 17, paragraph 1.

6. A referral under paragraph 4 shall not affect any determination in the award other than the arbitral tribunal's fees and expenses; nor shall it delay the recognition and enforcement of all parts of the award other than those relating to the determination of the arbitral tribunal's fees and expenses.

## *Allocation of costs*

### *Article 42*

1. The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

2. The arbitral tribunal shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to pay to another party as a result of the decision on allocation of costs.

## *Deposit of costs*

### *Article 43*

1. The arbitral tribunal, on its establishment, may request the parties to deposit an equal amount as an advance for the costs referred to in article 40, paragraphs 2 *(a)* to *(c)*.

2. During the course of the arbitral proceedings the arbitral tribunal may request supplementary deposits from the parties.

3. If an appointing authority has been agreed upon or designated, and when a party so requests and the appointing authority consents to perform the function, the arbitral tribunal shall fix the amounts of any deposits or supplementary deposits only after consultation with the appointing authority, which may make any comments to the arbitral tribunal that it deems appropriate concerning the amount of such deposits and supplementary deposits.

4. If the required deposits are not paid in full within 30 days after the receipt of the request, the arbitral tribunal shall so inform the parties in order that one or more of them may make the required payment. If such payment is not made, the arbitral tribunal may order the suspension or termination of the arbitral proceedings.

5.    After a termination order or final award has been made, the arbitral tribunal shall render an accounting to the parties of the deposits received and return any unexpended balance to the parties.

*Annex*

**Model arbitration clause for contracts**

Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules.

> *Note.  Parties should consider adding:*

> *(a)* The appointing authority shall be . . . [name of institution or person];

> *(b)* The number of arbitrators shall be . . .. [one or three];

> *(c)* The place of arbitration shall be . . . [town and country];

> *(d)* The language to be used in the arbitral proceedings shall be . . . .

**Possible waiver statement**

> *Note.  If the parties wish to exclude recourse against the arbitral award that may be available under the applicable law, they may consider adding a provision to that effect as suggested below, considering, however, that the effectiveness and conditions of such an exclusion depend on the applicable law.*

*Waiver*

> The parties hereby waive their right to any form of recourse against an award to any court or other competent authority, insofar as such waiver can validly be made under the applicable law.

**Model statements of independence pursuant to article 11 of the Rules**

*No circumstances to disclose*

> I am impartial and independent of each of the parties and intend to remain so. To the best of my knowledge, there

are no circumstances, past or present, likely to give rise to justifiable doubts as to my impartiality or independence. I shall promptly notify the parties and the other arbitrators of any such circumstances that may subsequently come to my attention during this arbitration.

*Circumstances to disclose*

I am impartial and independent of each of the parties and intend to remain so. Attached is a statement made pursuant to article 11 of the UNCITRAL Arbitration Rules of *(a)* my past and present professional, business and other relationships with the parties and *(b)* any other relevant circumstances. [Include statement.] I confirm that those circumstances do not affect my independence and impartiality. I shall promptly notify the parties and the other arbitrators of any such further relationships or circumstances that may subsequently come to my attention during this arbitration.

*Note. Any party may consider requesting from the arbitrator the following addition to the statement of independence:*

I confirm, on the basis of the information presently available to me, that I can devote the time necessary to conduct this arbitration diligently, efficiently and in accordance with the time limits in the Rules.

# UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration

## *Article 1.    Scope of application*

*Applicability of the Rules*

1.    The UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration ("Rules on Transparency") shall apply to investor-State arbitration initiated under the UNCITRAL Arbitration Rules pursuant to a treaty providing for the protection of investments or investors ("treaty")\* concluded on or after 1 April 2014 unless the Parties to the treaty\*\* have agreed otherwise.

2.    In investor-State arbitrations initiated under the UNCITRAL Arbitration Rules pursuant to a treaty concluded before 1 April 2014, these Rules shall apply only when:

*(a)*    The parties to an arbitration (the "disputing parties") agree to their application in respect of that arbitration; or

*(b)*    The Parties to the treaty or, in the case of a multilateral treaty, the State of the claimant and the respondent State, have agreed after 1 April 2014 to their application.

*Application of the Rules*

3.    In any arbitration in which the Rules on Transparency apply pursuant to a treaty or to an agreement by the Parties to that treaty:

*(a)*    The disputing parties may not derogate from these Rules, by agreement or otherwise, unless permitted to do so by the treaty;

---

\*For the purposes of the Rules on Transparency, a "treaty" shall be understood broadly as encompassing any bilateral or multilateral treaty that contains provisions on the protection of investments or investors and a right for investors to resort to arbitration against Parties to the treaty, including any treaty commonly referred to as a free trade agreement, economic integration agreement, trade and investment framework or cooperation agreement, or bilateral investment treaty.

\*\*For the purposes of the Rules on Transparency, any reference to a "Party to the treaty" or a "State" includes, for example, a regional economic integration organization where it is a Party to the treaty.

*(b)* The arbitral tribunal shall have the power, besides its discretionary authority under certain provisions of these Rules, to adapt the requirements of any specific provision of these Rules to the particular circumstances of the case, after consultation with the disputing parties, if such adaptation is necessary to conduct the arbitration in a practical manner and is consistent with the transparency objective of these Rules.

*Discretion and authority of the arbitral tribunal*

4.   Where the Rules on Transparency provide for the arbitral tribunal to exercise discretion, the arbitral tribunal in exercising such discretion shall take into account:

*(a)* The public interest in transparency in treaty-based investor-State arbitration and in the particular arbitral proceedings; and

*(b)* The disputing parties' interest in a fair and efficient resolution of their dispute.

5.   These Rules shall not affect any authority that the arbitral tribunal may otherwise have under the UNCITRAL Arbitration Rules to conduct the arbitration in such a manner as to promote transparency, for example by accepting submissions from third persons.

6.   In the presence of any conduct, measure or other action having the effect of wholly undermining the transparency objectives of these Rules, the arbitral tribunal shall ensure that those objectives prevail.

*Applicable instrument in case of conflict*

7.   Where the Rules on Transparency apply, they shall supplement any applicable arbitration rules. Where there is a conflict between the Rules on Transparency and the applicable arbitration rules, the Rules on Transparency shall prevail. Notwithstanding any provision in these Rules, where there is a conflict between the Rules on Transparency and the treaty, the provisions of the treaty shall prevail.

8.   Where any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the disputing parties cannot derogate, that provision shall prevail.

9.   These Rules are available for use in investor-State arbitrations initiated under rules other than the UNCITRAL Arbitration Rules or in ad hoc proceedings.

## *Article 2.   Publication of information at the commencement of arbitral proceedings*

Once the notice of arbitration has been received by the respondent, each of the disputing parties shall promptly communicate a copy of the notice of arbitration to the repository referred to under article 8. Upon receipt of the notice of arbitration from the respondent, or upon receipt of the notice of arbitration and a record of its transmission to the respondent, the repository shall promptly make available to the public information regarding the name of the disputing parties, the economic sector involved and the treaty under which the claim is being made.

## *Article 3.   Publication of documents*

1.   Subject to article 7, the following documents shall be made available to the public: the notice of arbitration, the response to the notice of arbitration, the statement of claim, the statement of defence and any further written statements or written submissions by any disputing party; a table listing all exhibits to the aforesaid documents and to expert reports and witness statements, if such table has been prepared for the proceedings, but not the exhibits themselves; any written submissions by the non-disputing Party (or Parties) to the treaty and by third persons, transcripts of hearings, where available; and orders, decisions and awards of the arbitral tribunal.

2.   Subject to article 7, expert reports and witness statements, exclusive of the exhibits thereto, shall be made available to the public, upon request by any person to the arbitral tribunal.

3.   Subject to article 7, the arbitral tribunal may decide, on its own initiative or upon request from any person, and after consultation with the disputing parties, whether and how to make available exhibits and any other documents provided to, or issued by, the arbitral tribunal not falling within paragraphs 1 or 2 above. This may include, for example, making such documents available at a specified site.

4. The documents to be made available to the public pursuant to paragraphs 1 and 2 shall be communicated by the arbitral tribunal to the repository referred to under article 8 as soon as possible, subject to any relevant arrangements or time limits for the protection of confidential or protected information prescribed under article 7. The documents to be made available pursuant to paragraph 3 may be communicated by the arbitral tribunal to the repository referred to under article 8 as they become available and, if applicable, in a redacted form in accordance with article 7. The repository shall make all documents available in a timely manner, in the form and in the language in which it receives them.

5. A person granted access to documents under paragraph 3 shall bear any administrative costs of making those documents available to that person, such as the costs of photocopying or shipping documents to that person, but not the costs of making those documents available to the public through the repository.

### *Article 4.  Submission by a third person*

1. After consultation with the disputing parties, the arbitral tribunal may allow a person that is not a disputing party, and not a non-disputing Party to the treaty ("third person(s)"), to file a written submission with the arbitral tribunal regarding a matter within the scope of the dispute.

2. A third person wishing to make a submission shall apply to the arbitral tribunal, and shall, in a concise written statement, which is in a language of the arbitration and complies with any page limits set by the arbitral tribunal:

*(a)* Describe the third person, including, where relevant, its membership and legal status (e.g., trade association or other non-governmental organization), its general objectives, the nature of its activities and any parent organization (including any organization that directly or indirectly controls the third person);

*(b)* Disclose any connection, direct or indirect, which the third person has with any disputing party;

*(c)* Provide information on any government, person or organization that has provided to the third person (i) any financial or other assistance in preparing the submission; or (ii) substantial assistance in either of the two years preceding the application by the third person under this article (e.g. funding around 20 per cent of its overall operations annually);

*(d)* Describe the nature of the interest that the third person has in the arbitration; and

*(e)* Identify the specific issues of fact or law in the arbitration that the third person wishes to address in its written submission.

3. In determining whether to allow such a submission, the arbitral tribunal shall take into consideration, among other factors it determines to be relevant:

*(a)* Whether the third person has a significant interest in the arbitral proceedings; and

*(b)* The extent to which the submission would assist the arbitral tribunal in the determination of a factual or legal issue related to the arbitral proceedings by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties.

4. The submission filed by the third person shall:

*(a)* Be dated and signed by the person filing the submission on behalf of the third person;

*(b)* Be concise, and in no case longer than as authorized by the arbitral tribunal;

*(c)* Set out a precise statement of the third person's position on issues; and

*(d)* Address only matters within the scope of the dispute.

5. The arbitral tribunal shall ensure that any submission does not disrupt or unduly burden the arbitral proceedings, or unfairly prejudice any disputing party.

6. The arbitral tribunal shall ensure that the disputing parties are given a reasonable opportunity to present their observations on any submission by the third person.

### *Article 5.  Submission by a non-disputing Party to the treaty*

1. The arbitral tribunal shall, subject to paragraph 4, allow, or, after consultation with the disputing parties, may invite, submissions on issues of treaty interpretation from a non-disputing Party to the treaty.

2. The arbitral tribunal, after consultation with the disputing parties, may allow submissions on further matters within the

scope of the dispute from a non-disputing Party to the treaty. In determining whether to allow such submissions, the arbitral tribunal shall take into consideration, among other factors it determines to be relevant, the factors referred to in article 4, paragraph 3, and, for greater certainty, the need to avoid submissions which would support the claim of the investor in a manner tantamount to diplomatic protection.

3.  The arbitral tribunal shall not draw any inference from the absence of any submission or response to any invitation pursuant to paragraphs 1 or 2.

4.  The arbitral tribunal shall ensure that any submission does not disrupt or unduly burden the arbitral proceedings, or unfairly prejudice any disputing party.

5.  The arbitral tribunal shall ensure that the disputing parties are given a reasonable opportunity to present their observations on any submission by a non-disputing Party to the treaty.

### *Article 6.   Hearings*

1.  Subject to article 6, paragraphs 2 and 3, hearings for the presentation of evidence or for oral argument ("hearings") shall be public.

2.  Where there is a need to protect confidential information or the integrity of the arbitral process pursuant to article 7, the arbitral tribunal shall make arrangements to hold in private that part of the hearing requiring such protection.

3.  The arbitral tribunal shall make logistical arrangements to facilitate the public access to hearings (including where appropriate by organizing attendance through video links or such other means as it deems appropriate). However, the arbitral tribunal may, after consultation with the disputing parties, decide to hold all or part of the hearings in private where this becomes necessary for logistical reasons, such as when the circumstances render any original arrangement for public access to a hearing infeasible.

### *Article 7.   Exceptions to transparency*

*Confidential or protected information*

1.  Confidential or protected information, as defined in paragraph 2 and as identified pursuant to the arrangements referred

to in paragraphs 3 and 4, shall not be made available to the public pursuant to articles 2 to 6.

2.    Confidential or protected information consists of:

*(a)* Confidential business information;

*(b)* Information that is protected against being made available to the public under the treaty;

*(c)* Information that is protected against being made available to the public, in the case of the information of the respondent State, under the law of the respondent State, and in the case of other information, under any law or rules determined by the arbitral tribunal to be applicable to the disclosure of such information; or

*(d)* Information the disclosure of which would impede law enforcement.

3.    The arbitral tribunal, after consultation with the disputing parties, shall make arrangements to prevent any confidential or protected information from being made available to the public, including by putting in place, as appropriate:

*(a)* Time limits in which a disputing party, non-disputing Party to the treaty or third person shall give notice that it seeks protection for such information in documents;

*(b)* Procedures for the prompt designation and redaction of the particular confidential or protected information in such documents; and

*(c)* Procedures for holding hearings in private to the extent required by article 6, paragraph 2.

Any determination as to whether information is confidential or protected shall be made by the arbitral tribunal after consultation with the disputing parties.

4.    Where the arbitral tribunal determines that information should not be redacted from a document, or that a document should not be prevented from being made available to the public, any disputing party, non-disputing Party to the treaty or third person that voluntarily introduced the document into the record shall be permitted to withdraw all or part of the document from the record of the arbitral proceedings.

5.    Nothing in these Rules requires a respondent State to make available to the public information the disclosure of which it considers to be contrary to its essential security interests.

*Integrity of the arbitral process*

6.    Information shall not be made available to the public pursuant to articles 2 to 6 where the information, if made available to the public, would jeopardize the integrity of the arbitral process as determined pursuant to paragraph 7.

7.    The arbitral tribunal may, on its own initiative or upon the application of a disputing party, after consultation with the disputing parties where practicable, take appropriate measures to restrain or delay the publication of information where such publication would jeopardize the integrity of the arbitral process because it could hamper the collection or production of evidence, lead to the intimidation of witnesses, lawyers acting for disputing parties or members of the arbitral tribunal, or in comparably exceptional circumstances.

### *Article 8.    Repository of published information*

The repository of published information under the Rules on Transparency shall be the Secretary-General of the United Nations or an institution named by UNCITRAL.

Printed in Austria



V.14-00024—February 2014—750

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Petitioner-Appellant Mercuria Energy Group Limited ("**Mercuria**") certifies the following:

**1. Parties and Amici.**

Petitioner-Appellant is Mercuria Energy Group Limited. Respondent-Appellee is the Republic of Poland. No *amici curiae* have appeared to date in this Court. The European Commission appeared as *amicus curiae* in the District Court below.

**2. Rulings Under Review.**

This appeal relates to the Memorandum Opinion (ECF 47) and separate implementing Order (ECF 48) issued by the District Court (McFadden, J.) on September 8, 2025, denying Petitioner's petition to confirm and recognize an arbitral award and granting, in part, Respondent's motion to dismiss. The Memorandum Opinion is not yet reported but is available at *Mercuria Energy Group Ltd. v. Republic of Poland*, No. 1:23-cv-003572-TNM, 2025 WL 2591788 (D.D.C. Sept. 8, 2025).

**3. Related Cases.**

This case has not previously been before this Court or any court other than the District Court. Counsel is not aware of any cases that involve substantially the

same parties and the same or similar issues and are therefore related within the

meaning of D.C. Cir. Rule 28(a)(1)(C).

# <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Mercuria makes the following disclosure:

Petitioner-Appellant Mercuria is a limited liability company engaged in global commodities trading in the energy market.  Its parent company is Mercuria Energy Group Holding Limited.  No publicly traded company owns 10% or more of Mercuria's stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............i

RULE 26.1 DISCLOSURE STATEMENT .........................................................iii

TABLE OF CONTENTS ..............................................................................iv

TABLE OF AUTHORITIES...............................**Error! Bookmark not defined.**

GLOSSARY OF ABBREVIATIONS..................................................................ix

INTRODUCTION ....................................................................................... 1

JURISDICTIONAL STATEMENT.................................................................. 8

STATEMENT OF ISSUE ............................................................................. 9

STATEMENT OF THE CASE ...........................**Error! Bookmark not defined.**

    I.     Factual Background ........................................................ 11

          A.     The Energy Charter Treaty...................................... 11

          B.     Mercuria Invests in Poland..................................... 13

          C.     Mercuria Resorts to Arbitration Under the ECT...................... 15

          D.     The EC Mounts a Campaign Against Investment Arbitration .............................................................. 18

          E.     Sweden Annuls Mercuria's Award ......................... 21

          F.     Courts and Tribunals Outside the EU Reject the Intra-EU Objection ............................................................. 23

    II.    Procedural History ........................................................ 25

          A.     Petition to Confirm................................................. 25

          B.     The District Court's Decision.................................. 27

SUMMARY OF ARGUMENT....................................................................... 28

STANDARD OF REVIEW ........................................................................... 32

ARGUMENT............................................................................................. 32

    I.     The District Court's Comity Analysis Was Misconceived and Erroneous ................................................................... 32

II.   RECOGNITION OF THE SVEA cOURT JUDGMENT WOULD Violate Multiple Elements of U.S. Public POlicy ............. 37

    A.   The Svea Court Decision Allows Poland to Escape Its Bargained-For Treaty Obligations to Mercuria, Which Relied in Good Faith Upon Them ........................................... 38

    B.   The Svea Decision Countenances an Implicit Expropriation by Poland of Mercuria's Property .................... 41

    C.   *Komstroy* and the EC's Declarations are Tantamount to Retroactive Lawmaking ........................................................... 42

    D.   The District Court's Recognition of the Svea Decision Would Leave Mercuria Without an Adequate Forum for Its Claim .................................................................................. 46

    E.   The Award is Clearly Subject to Recognition Under U.S. Arbitration Law and the Svea Decision Is Contrary to the U.S. Policy Favoring International Arbitration ....................... 50

III.  The District Court Erred in Concluding that a Finding of "Protectionism" Is Necessary to Enforce an Award Notwithstanding Set-Aside ................................................................. 53

CONCLUSION ............................................................................... 57

**Page(s)**

**Cases**

*BCB Holdings Ltd. v. Gov't of Belize*,
110 F. Supp. 3d 233 (D.D.C. 2015) .................................................................. 56

*Blasket Renewable Inv. v. Kingdom of Spain*,
665 F.3d 1 (D.D.C. 2023), *rev'd sub. nom, NextEra Global
Holdings v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024) ........................ 3

*Blasket Renewable Invs. LLC v. Kingdom of Spain*,
No. 20-1081 (BAH), 2025 WL 3516146 (D.D.C. Sept. 11, 2025) .................... 23

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ................................................................................ 42, 43

*Chevron Corp. v. Republic of Ecuador*,
795 F.3d 200 (D.C. Cir. 2015) ................................................................ 8, 11, 50

*Commodities Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*,
49 F.4th 802 (2d Cir. 2022) .............................................................................. 48

*Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de
Chihuahua S.A.B*,
58 F.4th 429 (10th Cir. 2023) ...................................................................... 6, 33, 50

*Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De
C.V. v. Pemex-Exploracion Y Produccion*,
832 F.3d 92 (2d Cir. 2016) .......................................................................... *passim*

*Cube Infrastructure SICAV v. Kingdom of Spain*,
No. 20-1708 (LLA) 2025 WL 2374517 (D.D.C. Aug. 14, 2025) ...................... 23

*DNZ v. DOA*
[2026] SGHC(I) 1 (Sing. Int'l Comm. Ct., Jan. 9, 2026) ................................ 24

*Getma Int'l v. Republic of Guinea*,
862 F.3d 45 (D.C. Cir. 2017) .......................................................................... 33

*Henry Schein Inc. v. Archer & White Sales*,
586 U.S. 63 (2019) ................................................................... 48

*Hilton v. Guyot*,
159 U.S. 113 (1895) .................................................................. 36

*Laker Airways Ltd. v. Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984) ................................................. 36

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ............................................................ 42, 45

*LLC SPC Stileks v. Republic of Moldova*,
985 F.3d 871 (D.C. Cir. 2021) ........................... 8, 30, 47, 51

*Marmet Health Care Center, Inc. v. Brown*,
565 U.S. 530 (2012) .................................................................. 50

*Mitsubishi Motors*,
473 U.S. at 631 .......................................................................... 50

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
112 F.4th 1088 (D.C. Cir. 2024) ................................... *passim*

*Parsons & Whittemore Overseas Co. v. Societe Generale de
l'Industrie du Papier*,
508 F.2d 969 (2d Cir. 1974) ..................................................... 56

*Republic of Moldova v. Komstroy LLC*
(Sept. 2, 2021) ............................................................... *passim*

*Slowakische Republik v. Achmea BV*
(Mar. 6, 2018) ............................................................... *passim*

*Spain v. A* ............................................................................. 24

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
487 F.3d 928 (D.C. Cir. 2007) ...................................... *passim*

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
411 F.3d 296 (D.C. Cir. 2005) ................................................. 47

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
126 F.3d 15 (2d Cir. 1997) ................................................................... 52

**Statutes**

9 U.S.C. §§ 201 - 208. ...................................................... 3, 9, 25, 35, 50

28 U.S.C. § 1291 ................................................................................ 8

28 U.S.C. § 1330(a) ........................................................................... 8

21 U.S.T. 2517 ............................................................................... 3, 9

330 U.N.T.S. 38 ............................................................................. 3, 9

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(6) and (1) ................. 8, 25

U.S. Arbitration Law ......................................................................... 50

**Other Authorities**

Restatement (Third) of the U.S. Law of International Commercial &
Investment Arbitration § 4.9 n.d (2023) .............................................. 33

# GLOSSARY OF ABBREVIATIONS

Energy Charter Treaty ("**ECT**")

Decision ("**Svea Decision**") by the Svea Court of Appeal in Stockholm (the

Svea Court of Appeal in Stockholm (the "**Svea Court**")

Convention for the Recognition and Enforcement of Foreign Arbitral

Awards, (the "**New York Convention**"), 21 U.S.T. 2517, 330 U.N.T.S. 38, 9

U.S.C. §§ 201 *et seq.*

European Union ("**EU**")

International Centre for Settlement of Investment Disputes ("**ICSID**")

Energy Charter Treaty ("**ECT**")

European Commission ("**EC**")

Court of Justice of the European Union (the "**CJEU**")

Investor–State Dispute-Settlement ("**ISDS**")

United Nations Commission on International Trade Law ("**UNCITRAL**")

Arbitration Institute of the Stockholm Chamber of Commerce ("**SCC**")

J&S Energy S.A. ("**JSE**")

Material Reserves Agency ("**MRA**")

First SCC arbitration commenced in July 2008 ("**First ECT Arbitration**")

Second SCC arbitration commenced on September 12, 2019 ("**Second ECT**

**Arbitration**")

## INTRODUCTION

This case represents one of the most significant arbitration-related controversies ever to come before the U.S. courts. As the Court is surely aware, this Court, and courts in other circuits, have grappled periodically with the question of the circumstances under which a U.S. court may recognize and enforce an arbitration award that has been annulled by a foreign court at the seat of arbitration. In every prior instance, the inquiry focused on a single case, and typically on the foreign court's (or its parent government's) treatment of that singular case and the parties involved in it.

Like those cases, this case involves an arbitral award (the "**Award**") that Petitioner-Appellant Mercuria obtained against Poland; the Svea Court of Appeal ("**Svea Court**"), a Swedish appellate court seated in Stockholm, annulled the Award, finding that the treaty-based arbitration provision pursuant to which it was rendered is inconsistent with the internal law of the European Union ("**EU**"). Like the prior cases involving annulled awards, this Court's decision in this case will determine whether Mercuria will be able to recover the more than PLN 145 million (approximately US\$39.8 million) that the arbitral tribunal awarded it.

But as the Court is likely aware, its decision in this case will also dictate the outcome of multiple trailing cases involving similarly-situated investors who, having relied in good faith on the investor protections and dispute resolution mechanisms of

the Energy Charter Treaty ("**ECT**") when making energy-related investments in the EU, commenced and prevailed in arbitrations convened under the ECT, only to have the EU member states—and the European Commission ("**EC**")—claim that their awards are invalid because they conflict with EU law. The cases—at least 18 by Mercuria's count, involving claims totaling well over $1 billion in claimed losses—will turn on the same legal issue, and this Court's decision will play a large role in determining whether those award creditors are able to recover their losses, all of which were caused by conduct that arbitration tribunals found violated bedrock principles of international law.

For their part, the EU member states contesting these claims—together with the EC—make no secret of their political objective to eliminate "intra-EU" investor state arbitrations, *i.e.*, arbitrations brought under treaty-based arbitration provisions by investors from EU member states against other EU member states. As part of their campaign, they have claimed that intra-EU arbitrations are essentially—and have "always" been thought to be—unconstitutional under the EU's founding treaties, and have thus sought to illegitimize, and vacate, every intra-EU arbitration award that has been rendered under the ECT. It is no overstatement to say that the EU and its member states seek to wipe out an entire class of investment arbitration awards based on arguments that, as recently as ten years ago, the EU Advocate General acknowledged were unheard of. JA8584, ¶ 43.

Courts in Europe—including the Court of Justice of the European Union ("**CJEU**")—have accepted the argument. No court anywhere else, with the exception of the District Court in this case and one other court in this Circuit (whose decision has since been reversed by this Court) has done so.[1] Foreign courts outside the EU have rejected the argument unanimously. So too have all but three of the scores of arbitration tribunals to consider it.

It is undisputed that the United States, as a member of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "**New York Convention**"), 21 U.S.T. 2517, 330 U.N.T.S. 38, codified at 9 U.S.C. §§ 201 *et seq.*, has legal authority under both the New York Convention and its own prior decisions to recognize the Award. The question for this Court is whether the United States wishes to place its seal of approval on a foreign court decision—and ultimately on a broader campaign by the EU and its institutions—that would disentitle Mercuria and its similarly-situated ECT award creditors from recovering the losses they suffered as a result of violations of international law. As such, the Court's decision in this case will represent a major policy statement reflecting the United States' commitment to its arbitration-related treaty obligations and its commitment to the proper

---

[1] *Blasket Renewable Inv. v. Kingdom of Spain*, 665 F.3d 1 (D.D.C. 2023), *rev'd sub. nom, NextEra Global Holdings v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024).

enforcement of international arbitration agreements, a commitment that this Court's and the Supreme Court's jurisprudence have underscored time and again.

At the threshold, Mercuria notes that, but for the Svea Court's decision ("**Svea Decision**"), there would not be a scintilla of doubt that the Award would be subject to recognition in the United States. There is no question—and this Court has already found—that under binding Circuit law, an agreement to arbitrate was made as a matter of fact, and that its application to EU-based investors having claims against EU member states was likely intended as a matter of law. *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1102–04 (D.C. Cir. 2024). There are no allegations of procedural irregularity or misconduct. Indeed, **none** of the circumstances that typically lead courts to annul arbitration awards are present. As this Court is aware, awards between intra-EU parties decided under the **very same dispute resolution clause** of the **very same treaty** that were arbitrated under the Rules of the International Centre for Settlement of Investment Disputes ("**ICSID**")—which leave no provision for annulment by national courts—are being routinely recognized and enforced by the district courts in this Circuit. And as mentioned above, not a single national court system outside the EU has accepted or adopted the arguments that Poland and the EC advanced before the District Court.

The skepticism of non-European courts toward the EU's arguments is unsurprising: Those arguments rest on a series of blatantly counter-textual

interpretations of the ECT and representations that the factual and historical record flatly disprove. Poland's position in this case rests in large part on its factual claim that it was "always" understood that intra-EU arbitration under the ECT was prohibited. As discussed, further herein, and as documented before the District Court, that central claim is firmly rebutted by the record evidence, which demonstrates that the EU's hostility toward intra-EU arbitration is a come-lately position that crystallized and gained political currency just as EU member states were facing a cavalcade of claims under the ECT.

The District Court largely ignored this evidence, finding, in sum and substance, that Mercuria's failure to heed a "declaration" issued by several EU member states asserting that intra-EU arbitration was impermissible under EU law robs Mercuria of any ability to claim that it relied on the law as it clearly stood when it commenced the arbitration at issue in this appeal, or to otherwise claim that it had a legitimate expectation to rely on the arbitration provisions set forth in Article 26 of the ECT. But the District Court's analysis fails even on its own terms—noting, as it does, that the declaration it identified as a "warning" to Mercuria acknowledged that the law as it stood when the arbitration was commenced **did not prohibit intra-EU arbitration** under the ECT. When viewed against the larger record, however, the District Court's decision becomes virtually indefensible; it accords near-total deference to the Svea

Decision and dismisses the relevant policy factors without any meaningful discussion of the evidence demonstrating how the Svea Decision violates them.

This is a case about comity, and whether the U.S. should give effect to the Svea Decision by refusing to recognize the Award. The District Court recognized this, but it misapprehended the relevant analysis. Mercuria did not, as the District Court put it, ask the District Court to find that "the EU's highest court and Sweden's highest court are wrong about EU law" or otherwise to "superintend" or "Monday morning quarterback" the Svea Court's analysis of European law. JA13501. What Mercuria has argued consistently is that the Svea Court and the CJEU, each at the urging of the EC, applied domestic EU law in a manner as to rob Mercuria (and multiple other investors) of its rights under **international law**, and that the Svea Court's decision—regardless of its correctness as a matter of EU law—is fundamentally inconsistent with U.S. public policy.

The record leaves no question that it is. Judged against the factors identified by two of the leading cases on point—*Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion,* 832 F.3d 92, (2d Cir. 2016) ("***Pemex***") (which applied this Court's decision in *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007) ("***TermoRio***")), and the Tenth Circuit's ruling in *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B*, 58 F.4th 429 (10th Cir. 2023) ("***Compañía***")—it is clear that

deferral to the Svea Decision would indeed violate the policy interests informing the comity analysis applicable to foreign court decisions annulling arbitration awards. Specifically, the record demonstrates that the Svea Decision:

- facilitated a repudiation by Poland and the EU of its treaty obligations toward investors under the ECT;

- constituted a retroactive change in law that robbed Mercuria of its legitimate contractual expectations;

- left Mercuria without the ability to seek a forum where it could seek meaningful relief for its claims; and

- facilitated an expropriation of Mercuria's property rights.

The District Court's decision dismissed each of these policy concerns in a cursory manner and with virtually no discussion of the evidence documenting them. As a result, this Court should reverse the District Court's ruling and hold that recognition of the Svea Decision is incompatible with U.S. public policy, and accordingly recognize the award at issue in this case.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1330(a), as a result of the applicability of the arbitration and waiver exceptions set forth in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(6) and (1), because Poland is a member of the New York Convention and agreed to arbitration in Sweden, a Convention signatory state. *See Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204–06 (D.C. Cir. 2015*); LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877–78 (D.C. Cir. 2021).

The District Court entered judgment dismissing Mercuria's petition on September 8, 2025. JA2983; JA2965. Mercuria filed a notice of appeal. JA2984. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUE

1.      Whether the district court erred in extending comity to the Svea Decision and granting in part Respondent-Appellee Poland's Motion to Dismiss and Opposition to Petition to Confirm Arbitration Award, by deferring to a foreign court's interpretation of foreign law rather than applying U.S. public policy, and refusing to enforce an international arbitral award against a foreign sovereign pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38, 9 U.S.C. §§ 201 *et seq.*

## <u>STATUTES & TREATIES</u>

9 U.S.C. §§ 201 - 208. ......................................................................... Add. 1

28 U.S.C. § 1291 ................................................................................. Add. 2

28 U.S.C. § 1330(a) ............................................................................ Add. 3

28 U.S.C. § 1605 ................................................................................. Add. 4

21 U.S.T. 2517 .................................................................................... Add. 5

330 U.N.T.S. 38 .................................................................................. Add. 6

U.S. Arbitration Law .......................................................................... Add. 7

.

**STATEMENT OF THE CASE**

## I.    FACTUAL BACKGROUND

### A. The Energy Charter Treaty

The Energy Charter Treaty ("**ECT**") is a multilateral treaty, concluded in 1994 and in force since 1998, designed to facilitate cross-border energy trade and investment by ensuring non-discriminatory treatment and reliable dispute resolution for investors in the energy sector.  JA680; JA681.  It contains substantive investor protections, each of which is accorded and governed by international law without regard to local law—including obligations on the part of signatory states to accord fair and equitable treatment, constant protection and security, and to observe obligations entered into with investors—as well as a self-contained Investor–State Dispute-Settlement ("**ISDS**") system that guarantees investors from signatory states the right to have disputes concerning breaches of those substantive protections heard by an arbitral tribunal, as opposed to in national courts.  JA689; JA690; JA701; JA702.

The ISDS provision set forth in Article 26 of the ECT is clear and unequivocal, and under well-settled arbitration jurisprudence, constitutes a standing, unilateral offer by each signatory state to arbitrate disputes with qualifying investors over alleged breaches of the Treaty.  *See, e.g., Chevron Corp. v. Ecuador*, 795 F.3d 200, 206 (D.C. Cir. 2015) (explaining that treaty ISDS provision constitutes "a standing

offer . . . to arbitrate investment disputes"). In pertinent part, Article 26(3)(a) provides:

> [E]ach Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

JA701, Art. 26(6). It further grants investors the right, after a cooling-off period, to submit disputes to their choice of (i) ICSID arbitration (if the Respondent state is a member of the ICSID Convention, which Poland, at the time this dispute arose, was not), (ii) ad hoc arbitration pursuant to the United Nations Commission on International Trade Law ("**UNCITRAL**") Rules, or (iii) arbitration under the Arbitration Institute of the Stockholm Chamber of Commerce ("**SCC**"), with the seat determined by the applicable institutional rules. *Id.*

Crucially, Article 26(6) instructs arbitral tribunals convened under its auspices to decide disputes "in accordance with this Treaty and applicable rules and principles of international law," reflecting the parties' choice to resolve both jurisdictional and merits questions under international law rather than under the internal law of any State (or union of States). *Id.* In addition, Article 16 of the ECT establishes a investor-protective conflict-of-treaties rule: Where the ECT conflicts with another international agreement, the provision "more favourable to the Investor or Investment" shall prevail and "shall not be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect

thereto." JA694, Art. 16. The ECT contains no "disconnection clause" or any carve-out precluding its application among EU Member States. JA7361–64, ¶¶ 86–91. In other words, there is nothing in the text of the ECT that could possibly serve to limit its scope of application between EU nationals and EU Member States.

Poland ratified the ECT and has been bound by its terms throughout the relevant period; Cyprus (Mercuria's home State)[2] and Sweden (seat of arbitration) are likewise ECT Contracting Parties—as is the EU itself. JA13430-32. For decades after the ECT's entry into force, EU Member States—including Poland and Sweden—willingly participated in ECT arbitrations brought by EU and non-EU investors alike, without asserting that the Treaty's arbitration clause was inapplicable intra-EU. JA7103-06, §§ I–IV. This practice was consistent with and confirmed the ECT's plain text and the understanding that Article 26's consent extended to **all** qualifying investors irrespective of nationality within or outside the EU. JA7360-61, ¶¶ 82-86; JA7367, ¶¶ 101-03.

### B. Mercuria Invests in Poland

Mercuria entered the Polish market in the early 2000s through its Polish affiliate, J&S Energy S.A. ("**JSE**"), which imported and traded fuels under Poland's regulated compulsory reserves framework. JA64 (Award, ¶¶ 174–75). As part of

---

[2]    Mercuria has since re-domiciled in Bermuda. It was, at the time the arbitration was commenced, a domiciliary of Cyprus.

that framework, Poland's Material Reserves Agency ("**MRA**") imposed stockpiling obligations and assessed penalties for alleged shortfalls. On April 3, 2008 the MRA imposed an administrative fine of PLN 461,695,807.26 on JSE (later reduced to PLN 452,045,537.36 on June 5, 2008) (then equivalent to approximately US$185 million), for an alleged deficiency in compulsory reserves. JA11 (Petition ¶10); JA65 (Award ¶¶ 178–179. JSE financed payment of the penalty through an intercompany loan from Mercuria, creating a significant financing cost while challenges proceeded. JA77–79 (Award ¶¶ 240–47); JA7103–04 (Kołkowski Decl. ¶¶ 4–7). The MRA demanded payment of the penalty, with interest calculated from June 20, 2008. JA48 (Award ¶ 180).

JSE sought judicial review of the penalty in Poland. Polish administrative courts ultimately determined that the penalty had been unlawfully imposed and ordered reimbursement. JA7103–04 (Kołkowski Decl. ¶¶ 4–7). First, on December 23, 2008, the Provincial Administrative Court in Warsaw issued a judgment repealing the MRA's penalties, including the interest. JA66 (Award ¶ 188). The Supreme Administrative Court of Poland affirmed this judgment on October 20, 2009. *Id.* ¶ 189. Yet, despite those rulings, Polish authorities refused to pay back the interest component. JA81, JA113, JA295 (Award ¶¶ 247, 356, 930); JA7103–04 (Kołkowski Decl. ¶¶ 4–7). JSE initiated three further proceedings in the Polish courts attempting to obtain repayment, and, from 2010 to 2022, the Administrative Courts of Poland

rendered six judgments in favor of Mercuria and against the MRA.  JA68–71 (Award ¶¶ 199–210).  The MRA simply refused to comply with any of them.  JA71–72 (Award ¶¶ 213–215).  As a result, as the arbitral tribunal found, Mercuria and JSE suffered a persistent and continuing loss directly caused by Poland's confiscatory measure and by the failure of the Polish courts to provide protection to Mercuria's investment in the form of effective relief.  JA81, JA295 (Award ¶¶ 247, 930).

The record thus reflects repeated attempts by Mercuria to obtain full redress domestically in Poland, only to be met with delay and refusal to comply with the rulings of their own courts or by Poland's governmental organs.  JA7103–04 (Kołkowski Decl. ¶¶ 5–7; Petition ¶¶ 21–27). The arbitral tribunal later quantified this loss, awarding PLN 145,094,420.20 (approximately US$39.8 million at today's exchange rate) plus costs, corresponding to the interest losses and expenses traceable to Poland's internationally wrongful acts under the ECT.  JA295 (Award ¶ 930).

**C. Mercuria Resorts to Arbitration Under the ECT**

Confronted by Poland's exorbitant penalty and interest, Mercuria invoked the ECT's arbitration provision and commenced SCC arbitration in July 2008 ("**First ECT Arbitration**"), challenging Poland's unfair treatment of its investment under international law.  JA79 (Award ¶ 244).  Poland appeared, appointed arbitrators, and fully participated; as pertinent here, it never claimed that it lacked capacity under EU law to arbitrate with an EU-based investor under Article 26.  JA7111–20 (Kołkowski

Decl. Ex. A). During that proceeding, the parties litigated ECT jurisdiction and merits issues under international law in accordance with Article 26(6), consistent with the understanding—not controversial at the time—that Article 26 applied to intra-EU disputes. JA7120–22.

In December 2014, the tribunal dismissed Mercuria's claims. During the pendency of the arbitration proceedings, Poland's administrative courts issued and upheld a judgment repealing the penalty, and the MRA discontinued administrative proceedings against JSE. JA66 (Award ¶ 189); JA7104 (Kołkowski Dec. ¶ 6). The arbitral tribunal concluded that Poland had not breached its obligations under the ECT. Poland accepted the tribunal's determinations, including the costs order in its favor, and did not assert that the award—or the arbitration itself—was unlawful under EU law. JA295 (Award ¶ 245); JA7111–20 (Kołkowski Decl. Ex. A). Poland's conduct in that arbitration confirmed the uniform understanding at the time: EU Member States, including Poland, regarded ECT Article 26 as a binding consent to arbitrate in disputes with investors—including EU investors—and they did not invoke any supposed "intra-EU" carve-out for the simple reason that none exists in the ECT or under international law. JA7360–62; JA7367 (Bjorklund ¶¶ 82–86, 101–03).

Despite the outcome of the First ECT Arbitration and continued Polish domestic proceedings, however, Poland did not provide full compensation for

Mercuria's loss. By 2019, Poland's own courts had ordered Poland's administrative organs to repay the interest repeatedly; Poland simply refused to do so. JA71, JA77–78; (Award ¶ 211, 240–42). As a result of this fundamental failure of the Polish courts to provide effective relief, Mercuria commenced a second SCC arbitration on September 12, 2019 ("**Second ECT Arbitration**") under ECT Article 26(2)(c)—once again with Stockholm as the seat pursuant to the SCC Rules. JA521 (Notice of Arbitration). By the time Mercuria commenced the Second ECT Arbitration, the CJEU had rendered its decision in *Slowakische Republik v. Achmea BV* (Mar. 6, 2018) ("*Achmea*"), and various EU member states had issued a declaration expressing their view that as a result of *Achmea*, intra-EU arbitration was not permitted under the ECT. JA7360–61. As discussed below, *Achmea* did not support this conclusion; furthermore, Sweden did not sign the declaration. Nonetheless, in an abundance of caution, Mercuria attempted to seat the Second ECT Arbitration outside the EU. JA12806, ¶ 7. Poland, however, steadfastly refused to agree to this, insisting that the Second ECT Arbitration be seated in an EU member state. *Id.* Ultimately, Mercuria had no choice but to accede to that demand, and the Second ECT Arbitration was seated in Stockholm.

On the merits, Mercuria alleged, *inter alia*, that Poland had violated ECT Article 10(1) by failing to provide an effective means of asserting claims, because

Poland's administrative organs failed to repay the property that Poland's own courts had ordered be repaid. JA 60, JA81 (Award ¶¶ 163–64, 247)].

Unlike in the First ECT Arbitration, Poland in the Second ECT Arbitration objected to the tribunal's jurisdiction claiming that no arbitration agreement existed because Mercuria was an EU domiciliary and that EU law thus prohibited the arbitration (the "**Intra-EU Objection**"). The tribunal received extensive expert evidence, including on the interaction between international law and EU law and on prior practice under Article 26 of the ECT. After careful consideration, it rejected Poland's Intra-EU Objection, holding as a matter of international law that Article 26's consent, text, and context encompassed disputes between an EU investor and an EU Member State, and that EU law could not negate consent given under a multilateral treaty governed by international law. JA113 (Award § G; ¶¶ 356–57).

After full briefing and a merits hearing, the tribunal found Poland liable under the ECT for failure to provide effective redress and for measures resulting in the deprivation of Mercuria's rights in its investment, and awarded PLN 145,094,420.20 plus costs, with detailed findings linking the quantum to the unlawful penalty and subsequent non-payment of interest. JA81, JA295 (Award ¶¶ 247, 930).

**D. The EC Mounts a Campaign Against Investment Arbitration**

*1. Achmea*

Beginning in 2018—long after the ECT's entry into force and after Poland's participation in First ECT Arbitration with Mercuria—the CJEU decided *Achmea*, which held that arbitration clauses in **bilateral** investment treaties between EU Member States were incompatible with Articles 267 and 344 of the Treaty on the Functioning of the European Union. Critically, *Achmea* did not apply to multilateral treaties like the ECT, or to treaties (also like the ECT) to which the EU itself is a contracting party. JA7348, 7360–61 (Bjorklund ¶¶ 50, 82–86). Indeed, the CJEU's decision in *Achmea* specifically noted that it was the "settled case-law of the Court" that the EU has the "capacity to conclude international agreements" and consent "to submit to the decisions of a court which is created or designated by such agreements," without regard to whether such a court could refer questions of EU law to the CJEU. JA7348 ¶ 57; Bjorklund ¶ 50).

As mentioned above, despite the limited scope of *Achmea*, the EC, and some EU Member States, issued political declarations asserting that *Achmea* should extend to the ECT, though other EU member states—including Sweden—rejected that position and continued to acknowledge that ECT arbitration was available for intra-EU disputes. JA7361–64, JA7374–75 (Bjorklund ¶¶ 86–91, 128). Moreover, the CJEU continued to issue decisions suggesting that multilateral treaties to which the EU was a Contracting Party, like the ECT, would not be subject to the same logic as *Achmea*; specifically, in a ruling issued on April 30, 2019, the CJEU held that the

multilateral investor-state dispute settlement mechanism contained in the EU-Canada trade agreement did not "adversely affect[] the autonomy of the EU legal order," and was compatible with EU law. Case EU:C:2019:341, *Opinion Pursuant to Art. 218(11) TFEU* (Apr. 30, 2019), ¶ 106-119. It is undisputed that this was the state of the law when Mercuria commenced the Second ECT Arbitration.

## 2. *Komstroy*

In 2021—two years after Mercuria had initiated the Second ECT Arbitration—the CJEU issued its ruling in *Republic of Moldova v. Komstroy LLC* (Sept. 2, 2021) ("***Komstroy***"), a case that did not involve any parties from the EU. In *Komstroy*, the CJEU ruled that Article 26 of the ECT was incompatible with EU law insofar as it provided for arbitration between EU investors and EU Member States. The pronouncement was not necessary to its ruling on the case before it, and was premised solely on EU constitutional considerations, not on the ECT's text or international-law interpretive rules. JA7375, 7367 (Bjorklund ¶¶ 90–91, 101–03).

Thereafter, the EC undertook a concerted campaign to implement this position, including through guidance to member states, interventions as *amicus* in national courts, and infringement warnings to States (including Sweden) perceived as insufficiently aligned with the EC's position. RA7360–7361 (Bjorklund, ¶¶ 82–85). For example, on December 2, 2021, the EC announced it was threatening Sweden (along with other EU Member States) with "enforcement actions" for insufficient

vigor in supporting the EC's efforts to terminate intra-EU arbitration. RA 12726 (EC Infringement Decisions, Dec. 2, 2021).

In parallel, the EC and certain EU member states initiated discussions with other ECT member states to "modernize" the ECT, proposing specifically to eliminate intra-EU arbitration under Article 26 through the addition of a disconnection clause. RA7367–68 (Bjorklund, ¶ 104). The EU-led efforts to "modernize" the ECT did not bear fruit, and Poland withdrew from the ECT on December 28, 2022 (with effect on December 29, 2023). JA12687 (Poland Written Notification of ECT Withdrawal). The EU followed suit on May 30, 2024 (with effect on June 28, 2025). JA12693 (EU Written Notification of ECT Withdrawal). Critically, this withdrawal did not, and could not, have retroactive (or even immediate prospective, as it was subject to a 20-year sunset clause) effect as a matter of international law, under the plain text of the ECT. JA8576–77 (Dashwood ¶ 20).

### E. Sweden Annuls Mercuria's Award

Poland filed its set-aside application in the Svea Court shortly after the Award issued, and obtained an *ex parte* "inhibition" order on March 6, 2023 staying enforcement in Sweden pending determination of the merits. JA7329–30 (Ragnwaldh ¶¶ 5–6). Poland's annulment petition argued that the Award was required to be set aside on the ground that under *Achmea* and *Komstroy*, no valid

arbitration agreement could be entered into between an EU investor and an EU Member State under the ECT, as any such agreement would violate EU law.

Mercuria opposed both applications, explaining that Article 26 of the ECT contains an unconditional offer to arbitrate that is governed by international law; that Article 26(6) directs tribunals to apply "this Treaty and applicable rules and principles of international law," not EU law; that the EU's separate accession to the ECT indicated its acceptance of Article 26 as written and negated any view that it was incompatible with or unenforceable as a result of EU law; and that Article 16's conflict rule expressly contemplated—and prohibits—the subordination of ECT rights and remedies to less investor-favorable obligations imposed by the EU treaties. Mercuria also submitted expert evidence on the Vienna Convention on the Law of Treaties, the ECT's drafting history, and state practice demonstrating that the Treaty contains no intra-EU carve-out or disconnection clause.

The Svea Court rejected these arguments and set aside the Award on December 23, 2024. The court held that, under *Komstroy* and related EU jurisprudence, arbitration between an EU investor and an EU Member State under Article 26 of the ECT is incompatible with EU law, and that an award rendered in such proceedings is invalid in Sweden. The Swedish Court treated *Komstroy* as dispositive on the intra-EU question, explaining that because "the arbitral award in question here was issued in an investment dispute between a Member State and an investor from another

Member State" it was inherently invalid, and "there is no need to examine other grounds for invalidity." JA12601 (Svea Decision at 13). The Svea Court rejected Mercuria's reliance on the ECT's text and international law, and declined to give effect to ECT Article 16. RA12592–12603 (Svea Decision at 4–15).

### F. Courts and Tribunals Outside the EU Reject the Intra-EU Objection

The EC and EU Member States are alone in their view that Article 26 of the ECT does not permit intra-EU arbitration; national courts outside of Europe and international tribunals have consistently rejected the EC's view. Most pertinently, several district courts in this Circuit have recognized that the ECT's consent to arbitration turns on the Treaty's text and structure, rather than on evolving EU internal constitutional doctrines. *See, e.g., Cube Infrastructure SICAV v. Kingdom of Spain*, No. 20-1708 (LLA) 2025 WL 2374517 (D.D.C. Aug. 14, 2025) (enforcing ECT award rendered by ICSID tribunal over Intra-EU objection); *Blasket Renewable Invs. LLC v. Kingdom of Spain*, No. 20-1081 (BAH), 2025 WL 3516146 (D.D.C. Sept. 11, 2025) (same). And in *NextEra*, this Court explained that the Intra-EU Objection concerns the "scope, not the existence" of consent to arbitration under Article 26, and found that the plain text of the ECT offers "powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1102–04 (D.C. Cir. 2024). These reasons included the

"clear terms of the ECT's arbitration provision" and the fact that "if the ECT's drafters nonetheless intended to exempt intra-EU disputes, they could have done so though a 'disconnection clause,'" which it noted the EU had proposed, but failed to secure, during negotiation of the ECT. *Id.* at 1102.

Other non-EU jurisdictions have taken a similar approach. The Swiss Supreme Court, in *Spain v. A*, noting the apparent EU "'crusade' against intra-EU investment arbitration," rejected the Intra-EU Objection and confirmed that international law governs the ECT and nothing in the EU treaties or any decision by the CJEU could be deemed to limit the plain meaning of Article 26. JA7384 (Bjorklund ¶ 147). Similarly, the UK High Court of Justice has rejected the Intra-EU objection, and the courts of both Australia and New Zealand have likewise enforced intra-EU ECT awards under the ICSID Convention. JA7385, JA7386 (Bjorklund ¶¶ 150, 153). Most recently, Singapore did the same. *DNZ v. DOA* [2026] SGHC(I) 1 (Sing. Int'l Comm. Ct., Jan. 9, 2026). Likewise, all but two (out of more than 40) arbitral tribunals constituted under the ECT—both before and after *Komstroy*—have upheld jurisdiction over intra-EU disputes. JA7380 (Bjorklund ¶ 145). These tribunals have emphasized the basic principle of international law of *pacta sunt servanda* (that treaties are binding on signatory states and must be performed by them in good faith) and the Vienna Convention on the Law of Treaties' interpretive canons, and have

declined to treat the "autonomy of EU law" as a basis to negate the unconditional consent to arbitration given by signatory states in the ECT. JA8600-605.

Collectively, these decisions reflect a foundational principle of public international law: That a national or regional legal order cannot, through internal jurisprudence or political declarations concerning its own law, rewrite its obligations under a multilateral treaty to which non-regional actors are also party. *Id.* Investors like Mercuria, who reasonably relied on the ECT's plain text, on decades of state practice and longstanding, and on basic principles of international law accepting intra-EU arbitrations, remain entitled to the neutral forum that Article 26 promised and on which they relied. *Id.*

## II. PROCEDURAL HISTORY

### A. Petition to Confirm

Mercuria commenced this action on November 30, 2023 by filing a petition to confirm the December 29, 2022 SCC Award pursuant to Chapter 2 of the Federal Arbitration Act (the "**FAA**"), 9 U.S.C. §§ 201–208, and the New York Convention. The petition set out the Award's dispositive terms, attached certified copies of the Award and arbitration agreement, and alleged subject-matter jurisdiction under the FSIA's arbitration and waiver exceptions, 28 U.S.C. § 1605(a)(6) and (1).

The District Court stayed the action pending the Svea Court proceedings. JA12533 (Stay Opinion). Once that decision had been rendered, Poland filed a

renewed motion to dismiss that, as pertinent here, argued that recognition of the Award was required to be denied (a) under Article V(1)(a) of the New York Convention, because *Komstroy* rendered invalid Poland's standing offer to arbitrate with Mercuria under Article 26; and (b) under Article V(1)(e) of the Convention, because the Award had been set aside in Sweden. JA12538.

Mercuria opposed, arguing that the District Court should refuse to extend comity to the Svea Court's decision. Mercuria demonstrated, through both legal argument and expert submissions, that:

- Poland's and the EC's claim that intra-EU arbitration had "never been contemplated" and that *Komstroy* merely "confirmed" what had always been understood was blatantly false. *See* RA7347–65 (Bjorklund, ¶¶ 47–95; *see also* JA133 (Award ¶ 429) ("Therefore, by virtue of Article 16 of the ECT, Article 26 of the ECT should be understood to be *lex superior vis-à-vis* any conflicting provisions of EU law.");

- that it had relied in good faith on the availability of arbitration under the ECT;

- that, taking Poland's and the EC's arguments at face value, Poland and the EU executed a treaty that they knew was inconsistent with the EU

treaties when they executed it, and were demanding that Mercuria bear the burden of their error; and

- that enforcement of the Svea Court decision would leave Mercuria—which had already litigated and won in the Polish courts multiple times, only to have Poland disregard its own courts' decisions—without a meaningful venue in which to prosecute its claims.

On the basis of these showings, Mercuria demonstrated how the Svea Court's decision closely resembled the situation in *Pemex*, and how enforcement of the Svea Court's decision in the United States would constitute a fundamental violation of U.S. public policy. Mercuria never suggested that the Svea Court made an error of EU law; to the contrary, Mercuria demonstrated that the Svea Court's decision (as dictated by *Komstroy*) resulted in an abdication of treaty obligations under **international** law, the effect of which is to violate each of the policy interests identified by the Second Circuit in *Pemex*.

## B. The District Court's Decision

On September 8, 2025, the District Court issued a memorandum opinion and a separate order granting Poland's motion to dismiss. JA13485 (Slip. Op., ECF No. 47); JA13503 (Order, ECF No. 48). The court (i) held that comity required deference to the Swedish annulment under Article V(1)(e); (ii) concluded that U.S. public

policy did not justify refusing to enforce the Svea Decision because *Komstroy* was an "interpretation," not a retroactive change in law; (iii) read *NextEra* as counseling restraint in light of EU member-state proceedings; and (iv) distinguished *Pemex* as a case involving "protectionist undertones" and "outright expropriation," circumstances the District Court did not find present in this case, and further finding that, unlike in *Pemex*, Mercuria had not been left without a forum.  JA13496 (Slip Op. 12–18).  The District Court did not address Poland's argument that recognition of the Award was unwarranted under Article V(1)(a) of the New York Convention, and in fact conducted no independent analysis concerning whether the parties had reached a binding agreement to arbitrate.  The court dismissed the petition based solely on comity and its perceived need to give effect to the Svea Decision.  JA13501.  Mercuria timely appealed.  JA13504 (Notice of Appeal).

## SUMMARY OF ARGUMENT

The District Court's decision was predicated on a fundamental misstep:  The District Court framed its role as deciding whether "the EU's highest court and Sweden's highest court are wrong about EU law," and on that basis declined to properly engage with the facts and U.S.-law standards that govern New York Convention enforcement in U.S. courts.  JA2981 (Slip Op. 17).  But where, as here, a party opposes recognition of an Award that has been annulled by a court at the seat of arbitration, Circuit law requires the reviewing court to determine whether

recognition of the set-aside decision would violate core U.S. public policies. Importantly, such actions do **not** constitute a referendum on the propriety of the foreign court's local law analysis. The governing decision in this Circuit is *TermoRio*, and *Pemex* elucidates the *TermoRio* standard and demonstrates how U.S. courts should exercise their discretion in determining whether the foreign decision is repugnant to U.S. public policy. *TermoRio*, 487 F.3d at 938–39; *Pemex*, 832 F.3d at 106–12. The District Court's analysis in this case took the wrong approach, but even insofar as it followed the *Pemex* analysis, its analysis failed to take sight of powerful and abundant record evidence concerning Mercuria's legitimate expectations, the unsupportable and changing nature of Poland's and the EC's positions concerning EU law and its relationship to the ECT and international law (and the nakedly political and, Mercuria respectfully submits, parochial campaign driving that inconsistency), and the viability of alternative fora in which Mercuria could bring its claim. In all, the District Court's analysis amounted to near-blind deference to both *Komstroy* and the Svea Decision. This Court should reverse, for all the following reasons.

**First**, the court misframed the Article V inquiry, and by proceeding from an improper starting point, reached an erroneous conclusion. By framing the inquiry (and Mercuria's arguments) as being about whether the EU courts were "wrong," the court abdicated its obligation to apply **U.S.** law and public policy to the facts and

circumstances of this case, and to exercise its discretion under the Convention accordingly. JA2981 (Slip Op. 17). That error infected the entire analysis and led the court to rubber-stamp the Svea Decision rather than assess, under U.S. standards and policy interests, whether deference was appropriate here.

**Second**, the District Court erred in failing to take sight of abundant evidence demonstrating that the Svea Decision is repugnant to fundamental U.S. public policy interests, and is thus not deserving of comity. The District Court improperly narrowed the relevant U.S. policy interests to "expropriation" and discounted both the U.S. interest in seeing sovereigns uphold their contractual commitments and the fundamental U.S. opposition to retroactivity, expropriation of property, and claims being left without a venue in which to prosecute them. The District Court's failure to engage with the unique circumstances in this case—including its failure to recognize that the Award at issue here is, under U.S. arbitration law and policy, clearly subject to recognition, as shown by district courts in this Circuit recognizing awards in virtually identical cases—led it to conduct an overly deferential review and to reach the wrong result. Worse still, the District Court's decision rested on at least one finding—that Mercuria had an alternate forum in which to bring its claim—that was directly contrary to what the arbitral tribunal found. *See, e.g. LLC SPC Stileks v. Repub. of Moldova*, 985 F.3d 871, 878 (D.C. Cir. 2020) ("The standard is more

than mere deference . . . a court possesses no power" to decide questions the parties have assigned to the arbitrator).

**Third**, the District Court erred in finding that *Pemex* turned on "protectionist undertones" rather than the U.S. public policy interests that the Second Circuit specifically identified—and by ignoring record evidence that, even if protectionism were relevant, an unmistakable version of it is present here. *Pemex* does not contain any discussion of protectionism as a prerequisite to refusing comity to a foreign set aside decision. Regardless, the record details a clear political project by EU institutions to eliminate intra-EU arbitration after a cavalcade of claims and adverse awards against EU Member States. While the EU's hostility toward intra-EU arbitration may not smack of "protectionism" per se, the parochialism behind its campaign is unmistakable, as is its desire to direct investor-state disputes away from the agreed-upon arbitral tribunals authorized by Article 26 of the ECT and into national courts.

In short, the District Court's decision fails to engage with the case-specific facts and the governing US-law standards. Allowing it to stand would make U.S. courts complicit in an improper denial of justice that is irreconcilable with the New York Convention's pro-enforcement purpose, and with fundamental U.S. public policies. This Court should reverse and enforce the Award.

## STANDARD OF REVIEW

This Court reviews a district court decision dismissing a petition to enforce a foreign arbitral award on the basis of Art. V(1)(e) of the New York Convention *de novo*. *Termorio S.A. v. Electranta S.P.*, 487 F.3d 928, 932 (D.C. Cir. 2007).

## ARGUMENT

### I. THE DISTRICT COURT'S COMITY ANALYSIS WAS MISCONCEIVED AND ERRONEOUS

The District Court found that it would have to "decide that the EU's highest court and Sweden's highest court are wrong about EU law" in order to refuse to recognize the Svea Decision, and on that premise refused to do so. JA2981 (Slip Op. 17). That was error. A U.S. court sitting in secondary jurisdiction under the New York Convention does not adjudicate the correctness of foreign court decisions; it applies U.S. law to determine whether recognition "may" be refused and whether extending comity to recognize a foreign set-aside would be consistent with fundamental U.S. public policies and notions of fairness and justice. *See* 9 U.S.C. § 207 (court "shall confirm" unless a Convention defense is proven, and defenses are permissive); *TermoRio*, 487 F.3d at 938–39 (recognizing a "narrow public-policy gloss" that allows refusal of deference to a foreign annulment when deference would be "repugnant to fundamental notions of what is decent and just"); *Pemex*, 832 F.3d at 106–12 (enforcing an award notwithstanding annulment after applying U.S. public-policy considerations). In other words, the obligation is to apply the

Convention and gauge the foreign set-aside decision against U.S. public policy, not to "second-guess" the foreign court's decision under its own law.

Indeed, one of the distinctive features of the New York Convention is that it authorizes secondary jurisdiction courts to decide whether to recognize or enforce an Award, even if one or more grounds for non-recognition set forth under Article V of the Convention applies. *See* Art. V(1), New York Convention (providing, in contrast to predecessor Geneva Convention, that recognizing courts "may" refuse recognition to an award where any ground for non-recognition set forth in the Convention applies). The New York Convention fixes the exclusive grounds upon which a secondary jurisdiction court **may** refuse recognition—but never **requires** refusal of recognition even when a ground for recognition has been established. *See, e.g.*, Restatement (Third) of the U.S. Law of International Commercial & Investment Arbitration § 4.9 n.d (2023) ("The [New York] Convention[] do[es] not mandate denying recognition or enforcement of Convention awards in every case in which a ground is established. Rather, use of the term 'may' in the Conventions indicates that denial of recognition or enforcement is permitted, but not absolutely required.")

Consistent with the Convention's pro-enforcement tilt, U.S. courts have properly interpreted the text of the New York Convention to confer discretion to enforce awards—even if set aside by courts of the arbitral seat—when failure to do so would offend U.S. public policy. *TermoRio S.A.*, 487 F.3d at 937–39 ; *see also*

*Compañía,* 58 F.4th at 451 (district court did not abuse discretion in refusing to vacate judgment enforcing arbitral award under Rule 60(b)(5) when award was later annulled at seat).

*TermoRio* supplies the governing framework in this Circuit. *Getma Int'l v. Republic of Guinea*, 862 F.3d 45, 164 (D.C. Cir. 2017) (reaffirming *TermoRio*). There, this Court acknowledged that, as a matter of comity, a U.S. court will ordinarily give weight to an annulment by courts at the seat, but emphasized that comity is not an absolute command, and that there is a "a narrow public policy gloss on Article V(1)(e)." *TermoRio*, 487 F.3d at 938–39. Thus, the enforcing court must exercise its own judgment under U.S. law and should refuse to defer to the foreign set-aside where doing so would offend basic U.S. public policies, *i.e.*, be "repugnant to fundamental notions of what is decent and just" in the U.S. *Id.* at 939. *TermoRio* thus rejects the notion—erroneously embraced by the District Court here—that a foreign annulment is dispositive unless the U.S. court finds the foreign court's legal analysis to be wrong on its own terms.

The Second Circuit's decision in *Pemex* illustrates how that inquiry is properly conducted. In that case, the Second Circuit reasoned that "powerful considerations" of U.S. public policy, including "(1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum;

and (4) the prohibition against government expropriation without compensation" justified the district court's confirmation of the award at issue notwithstanding that it had been annulled by a court in Mexico, the seat of arbitration. 832 F.3d at 107. Thus, without purporting to question the Mexican courts' application of Mexican law, the Second Circuit applied U.S. policy considerations to determine whether to defer to the Mexican annulment and concluded that the Mexican court's judgment, regardless of whether it was correct as a matter of Mexican law, was inconsistent with U.S. public policy and should not be given effect in the United States. 832 F.3d at 112. *Pemex* thus underscores the point *TermoRio* makes: A U.S. court must independently assess, under U.S. law, whether comity to a foreign annulment is appropriate. *Id.* The District Court's contrary approach—treating its task as choosing sides in an EU-law debate and, on that basis, refusing to "superintend" the Svea Court and CJEU, *see* JA2974 (Slip Op. 10), clearly failed to implement this framework. While the District Court paid lip service to the U.S. policy standard, it found that it was obligated to "shun" the "self-aggrandizement" of "superintending EU courts as they interpret their own laws" and "refrain from armchair quarterbacking the EU's treatment of *Komstroy*." *See* JA2974 (Slip Op. 10); *see also id.* (framing public policy analysis as whether Svea Court engaged in "erroneous legal reasoning or misapplication of law").

As discussed further below, the District Court coupled its underemphasis on (and misidentification of) U.S. public policy with an overemphasis on the need to extend comity to the Svea Decision. Noting that comity was at its "zenith" because the United States has no "direct interest" in the outcome of a case involving EU law and a treaty to which the U.S. is not a party, JA13494–95 (citing *NextEra*, 112 F.4th at 1109-10),[3] the District Court's decision reveals showed little interest in determining the extent to which the Svea Decision could be harmonized with core American policies.

International comity, however, does not relieve U.S. courts of their obligation to ensure that enforcement of a foreign court decree does not violate U.S. public policy. To the contrary, the Supreme Court has held that comity "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other," but a principle to be applied by U.S. courts **in harmony with domestic law**

[3] The District Court's quote *NextEra* came from the portion of that opinion reversing the lower court's issuance of an anti-suit injunction against Spain, which had commenced litigation against the plaintiff in a European court to, inter alia, enjoin it from seeking to enforce its award, including in the United States. This Court's observation concerning the United States' lack of a "direct interest" had no bearing on its consideration of whether the award in that case should be recognized or whether the lower court owed any deference to a foreign court decision. Mercuria notes further that, as a signatory to the New York Convention, the United States does have an interest—and in fact a solemn treaty obligation—with respect to the Award in this case, which is subject to that treaty's provisions, regardless of whether the U.S. is a party to the ECT and/or any of the parties to this case are American.

**and policy**.  *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895); *Laker Airways Ltd. v. Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum.")  *TermoRio* enshrines that principle by preserving judicial discretion to withhold deference when U.S. standards would be compromised.  487 F.3d at 938–39.  By insisting that it would have to pronounce EU courts "wrong" to recognize the Award—and by deferring on that basis—the District Court abandoned the task that U.S. law requires.  The proper question was not whether the CJEU or the Svea Court correctly construed EU law, but whether  the Svea Court's (presumptively correct) application of EU law is reconcilable with U.S. policy interests.  Because the court fundamentally answered the wrong question (and, as discussed below, to the extent it purported to address that issue, reached the wrong conclusion), its dismissal should be reversed.

## II.  RECOGNITION OF THE SVEA COURT JUDGMENT WOULD VIOLATE MULTIPLE ELEMENTS OF U.S. PUBLIC POLICY

The Svea Decision is not deserving of comity because it is "repugnant to fundamental" U.S. public policy interests.  *TermoRio*, 487 F.3d at 939.  Viewed through the lens of *Pemex*, a review of the record reveals that the Svea Decision (i) failed to vindicate sovereign undertakings and waivers of sovereign immunity, (ii) facilitated expropriatory conduct and a fundamentally unfair denial of justice and due process, (iii) effected a retroactive application of the law, and (iv) denied Mercuria

any forum or effective remedy for its meritorious claims. *Pemex*, 832 F.3d at 107. In addition, Mercuria submits that enforcement of the Svea Decision would be inconsistent with U.S. commitments to bedrock international arbitration principles. The District Court erred in finding otherwise and should be reversed.

### A. The Svea Court Decision Allows Poland to Escape Its Bargained-For Treaty Obligations to Mercuria, Which Relied in Good Faith Upon Them

The first *Pemex* public policy factor concerns whether the foreign set-aside decision would undermine "the vindication of contractual undertakings and waiver of sovereign immunity." *Id.* There can be little doubt that the Svea Decision triggers this policy interest by permitting Poland to evade its bargained-for obligations under the ECT despite Mercuria's good-faith reliance on those obligations when it invoked arbitration. That outcome is repugnant to U.S. public policy. *Id.* at 107-10. U.S. public policy condemns state action that cancels a contractual or treaty-based right on which a party reasonably relied, and U.S. courts do not lend their authority to retroactive maneuvers that vitiate contractual waivers of sovereign immunity on which a party reasonably relied. *Id.*

The District Court disregarded the abundant evidence that Mercuria reasonably relied on Poland's standing, written consent to arbitrate in ECT Article 26, and the decades-long practice of EU Member States—including Poland's conduct **with Mercuria specifically**, which included participating in ECT arbitrations without

asserting any intra-EU carve-out. The District Court goes so far as to blame Mercuria for its predicament, noting that it had "advanced notice" that its "arbitration efforts were likely to collapse in the face of CJEU precedent, yet it chose to forge ahead anyway." JA13501 Slip. Op. at 17.

This conclusion is belied by the record. It is undisputed that when Mercuria commenced its Second ECT Arbitration with Poland, *Komstroy* had not been decided, and Sweden—which was the seat of the Second ECT Arbitration (as a result of Poland's (clearly tactical) refusal to arbitrate outside the EU)—had rejected the suggestion, which had begun to be made following *Achmea*, that intra-EU arbitration under the ECT was not permitted. *See* JA7360–62 Bjorklund ¶¶ 82–87). Put simply, at the time Mercuria commenced the Second ECT Arbitration, there was no "CJEU precedent" or other legal prohibition barring that arbitration, which was authorized under the plain terms of the ECT, and which was a continuation of the same dispute in connection with which Poland had previously submitted to the First ECT Arbitration while never raising the Intra-EU Objection. The District Court elides these circumstances entirely. And as Mercuria noted to the District Court, its expectations were further buttressed by, among other things, (a) the fact that Article 16 of the ECT expressly resolves intra-treaty conflicts in favor of Article 26 arbitration; and (b) the lack of a disconnection clause in the ECT covering intra-EU arbitration, despite the EU's having sought such a clause. JA7054–55.

The District Court never even mentioned these facts, instead faulting Mercuria for "forging ahead" because certain EU member states had issued a "declaration"—one with no legal effect and that was not adopted by the nation which was the seat of arbitration—"warning" parties not to bring any more intra-EU ECT arbitrations. What is more, the District Court found Mercuria at fault despite acknowledging that the declaration was, at best, predictive in nature. JA1348 (Slip. Op. at 4) ("Though *Achmea* discussed only **bi**-lateral treaties, not **multi**-lateral treaties like the ECT, the states cautioned that the ECT's arbitration clause was likely invalid too.") (emphasis original). Even the District Court's analysis, therefore, appears to acknowledge that there was no bar to the Second ECT Arbitration when it was brought, a finding with which this Court's ruling in *NextEra* appears to align. *NextEra*, 112 F.4th at 1102.

While the Svea Decision attempts to whitewash these facts by declaring that Poland's promise to arbitrate "never" extended to Mercuria, the pre-*Komstroy* record is clear as it can be. Mercuria does not offer this observation to challenge the Svea Decision's conclusions of Swedish and/or EU law, but merely to illustrate that, inasmuch as *Pemex* seeks to safeguard an investor's legitimate expectations in connection with an annulled arbitration award, the record related to Mercuria's expectations cannot be deemed settled by the Svea Court's attempt to sweep away years of common practice that preceded *Komstroy*. That is the *Pemex* paradigm: A sovereign changing the rules of the game after a private party has relied on its

commitments, leaving the award creditor without the remedy that the sovereign had promised. 832 F.3d at 108-10.

The District Court failed to take sight of any of this, and that failure was error.

### B. The Svea Decision Countenances an Implicit Expropriation by Poland of Mercuria's Property

The District Court's effort to distinguish *Pemex* on the ground that *Pemex* involved "outright expropriation" JA13498– 99 (Slip Op. 13–14) similarly misreads that decision and erroneously narrows the concept of expropriation, presumably to one where a government takes a foreign private party's property by force. *Id.* at 13 ("Poland has not seized any of Mercuria's property"). The District Court cites no authority in connection with its observation, however, and it is difficult, however, to see the difference. It is undisputed that Poland—using its sovereign power as exercised by the imposition of a fine—compelled Mercuria to pay money. *Id.* at 2. It is likewise undisputed that the Polish state, despite the issuance of several court rulings ordering its agency to return the interest accrued on that money, has refused to return it and done so without consequence, something that only a sovereign could do. In view of these undisputed facts, the District Court's casual assertion that there was "no seizure" is difficult to credit. Poland's refusal to return money that its own courts have recognized belonged to Mercuria is not meaningfully different, as a matter of U.S. public policy, as if the Polish state had seized the property by force. In either case, a private party is being unlawfully deprived of a clear property interest

through state action, without legal basis or compensation. If that not an expropriation by the strictest meaning of the term, it has the same effect, and the District Court's recognition of the Svea Court decision countenanced it.

**C. *Komstroy* and the EC's Declarations are Tantamount to Retroactive Lawmaking**

As discussed above, the "repugnancy of retroactive legislation" was a key component of the Second Circuit's reasoning as to why the district court there enforced an award notwithstanding its having been vacated by a Mexican court. *Pemex*, 832 F.3d at 107. That is for good reason: It is incontrovertible that there is a strong U.S. public policy against retroactive changes in law that disrupt parties' settled expectations. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law."); *see also*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (explaining retroactively canceling existing contract rights is repugnant to U.S. public policy, which repugnance is "deeply rooted in [Supreme Court] jurisprudence, and embodies a legal doctrine centuries older than our Republic"). Canceling "existing contract rights is [likewise] repugnant to United States law." *Pemex*, 832 F.3d at 108 (quoting *Landgraf,* 511 U.S. at 265). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* (quoting *Landgraf*, 511 U.S. at 265).

The District Court gave short shrift to Mercuria's retroactivity arguments, dismissing Mercuria's reliance on *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204 (1988) and, more centrally, dismissing any concern about *Komstroy* being a change in the law because *Komstroy* "was really a correction in their **understanding** of the law" and because "[p]ublic policy is not offended by the EU high court providing authoritative interpretations of EU law." JA13498 (Slip. Op. at 13) (emphasis original).

Viewed as a whole, the record demonstrates compellingly that *Komstroy* did indeed represent a change of law, not to mention a tortured and completely unpredictable interpretation of (and abdication by the EU of its obligations under) **international law**.

The timeline matters. In 2011, Mercuria brought the First ECT Arbitration; Poland fully participated, never asserting an intra-EU bar to ECT arbitration, and thereby acting in accordance with the then-settled understanding that Article 26's consent extended to EU investors. JA77–76 (Award ¶¶ 244–45). In 2018, the CJEU decided *Achmea*, a decision that only applied to BITs between EU Member States (and not to the multilateral ECT, to which the EU is itself a party). JA3348–49 (Bjorklund ¶¶ 50–52). On September 12, 2019, against that backdrop, Mercuria commenced the Second ECT Arbitration. JA113 (Award ¶ 356). Throughout 2020–2021, the Commission intensified a political and litigation campaign—issuing further

declarations, contesting arbitral jurisdiction based on the Intra-EU objection, and applying pressure on Member States, including Sweden—to extend *Achmea*'s logic to the ECT. JA7361–7364 (Bjorklund ¶¶ 86–91, 101–03). Mercuria commenced the Second ECT Arbitration in September 2019. In September 2021, in *Komstroy*, the CJEU pronounced (notwithstanding its lack of relevance to the case, which did not involve any parties from the EU) that ECT Article 26 is incompatible with EU law for intra-EU disputes. JA7364 (Bjorklund ¶¶ 90–91). In December 2022, the tribunal issued the Final Award for Mercuria. JA81, 295 (Award ¶¶ 247, 930). Poland obtained the Swedish Court's set-aside on December 23, 2024. RA 12592–12603 (Svea Decision at 4–15).

The chronology of this case thus shows that a forum available and reasonably relied upon by Mercuria in 2019 (and successfully used without objection in 2011) was retroactively nullified in late 2024 through a jurisprudential pivot advocated and propelled by EU institutions, and shows that the District Court's suggestion that Mercuria had "advance[] notice" and should have anticipated a retroactive change, JA2981ip Op. 17), is both unreasonable on its terms, and wholly inconsistent with the record.

That a court announced the pivot under the rubric of an "interpretation" does change the outcome. Under U.S. public policy, the dispositive inquiry is the reality of the change and its effect on settled expectations, not the formal label attached to

the mechanism of change.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (presumption against retroactivity protects reliance and settled expectations).  *Pemex* reinforces this point:  There, the State's retroactive application of law involved both legislative action (passing a new law) and judicial action (Mexican courts applying the new regime retroactively to annul an award), and the Second Circuit enforced the award because U.S. policy does not tolerate a sovereign's retroactive elimination of a bargained-for arbitral forum.  *Pemex*, 832 F.3d at 97–101, 106–12.  Indeed, the Second Circuit expressly noted in *Pemex* that the relevant inquiry is whether "**the effect** of the ruling amounts to retroactive application of that law." *Pemex*, 832 F.3d at 108 (emphasis added).  Whether a later change in law was legislatively or judicially effectuated, the **actual effect** on the party whose rights are being stripped as a result is the same:  The party is deprived of the benefit of the bargain that it entered into in good faith and in reasonable reliance on the existing law and obligations of the other party.  *See Pemex*, 832 F.3d at 108–109 (recalling that "settled expectations should not be lightly disrupted.").  The lesson is that judicial retroactivity can be just as disruptive—and just as incompatible with U.S. policy—as legislative retroactivity.  Calling *Komstroy* an "interpretation" does not change its retroactive operation when used, as here, to erase rights that existed when Mercuria filed the First and Second ECT Arbitrations and to unravel a final award

compensating it for Poland's refusal to return property to which both the Polish courts and arbitral tribunal have held it is lawfully entitled.

**D. The District Court's Recognition of the Svea Decision Would Leave Mercuria Without an Adequate Forum for Its Claim**

The District Court held that Mercuria retained "options" and thus did not face a denial of justice, relying on the availability of further proceedings in the Polish courts and a potential application to the European Court of Human Rights. JA13499-80 (Slip Op. 15-16). That conclusion was erroneous for three independent reasons, each grounded in the record and controlling U.S. law.

**First**, the court applied the wrong legal lens by importing an *ex ante forum non conveniens* concept of "adequate alternative fora" into an *ex post* New York Convention award-enforcement case. *Id.* (citing *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003) and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). Indeed, the District Court even recognized that this law was inapt, but reasoned that despite *forum non conveniens* "involv[ing] distinct legal requirements," the "general principles surrounding sufficiency of alternative forums are still informative." JA13499 (Slip Op. at 15 n.5). This was error. The *forum non* alternative forum analysis is necessarily *ex ante*: Where should a case be most easily heard? At the award enforcement stage, however, the question is *ex post*: Will the award creditor lack an actually effective remedy? Indeed, in this Circuit, *forum non conveniens* has no applicability in Convention enforcement actions precisely because

the New York Convention contemplates multiple simultaneous fora and because enforcement is about giving effect to a final adjudication and enabling execution against assets—not sending parties searching for theoretical alternative forums where they might obtain redress. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303-04 (D.C. Cir. 2005) (*forum non conveniens* inapplicable in award-enforcement cases due to unique execution interests); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 876 n.1 (D.C. Cir. 2021) (same). By evaluating hypothetical "options" in Poland or the European Court of Human Rights, rather than the real-world availability of actual enforcement under the New York Convention, the District Court was led astray by inapplicable case law. JA13499–13500 (Slip Op. 15-16).

**Second**, the tribunal already made detailed findings—on full evidence and following a hearing—that the Polish courts failed to afford Mercuria an adequate remedy for its associated losses. JA81, JA113, JA295 (Award ¶¶ 247, 356, 930). Those findings were not collateral; they were the **core merits determination** in the Second ECT Arbitration under governing international law—specifically, ECT Article 10(1)—that Poland denied effective means and failed to provide full redress. JA60, JA81, JA113 (Award ¶¶ 163-64, 247, 356). In treating Polish courts as an "available remedy" notwithstanding those already adjudicated facts, JA13499–13500 (Slip Op. 15-16), the District Court directly second-guessed the arbitral tribunal's legal and factual rulings and erroneously substituted its own findings for those of the

arbitral tribunal. It is well-settled under U.S. arbitration law that a court lacks the power to substitute its own ruling for that of the tribunal. *Henry Schein Inc. v. Archer & White Sales*, 586 U.S. 63, 69 (2019) (court explaining "a court may not decide a merits question that the parties have delegated to an arbitrator"); *see also Commodities Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 819 (2d Cir. 2022) (rejecting party's defense to enforcement under New York Convention where it sought to "relitigate the Panel's factual determinations").

**Third**, the District Court's suggestion that an application to the European Court of Human Rights ("**ECHR**") supplies a meaningful "remedy" simply ignores the record and is incompatible with the New York Convention's remedial focus. JA2980 (Slip Op. 16). Neither Poland nor the District Court identified **any claim** that Mercuria could bring before the ECHR. Even if such a claim existed, however, the record is clear that the ECHR cannot render money judgments that can be enforced against Poland's assets; at most, that court can "direct" Poland to return the funds Mercuria is owed, much like the Polish courts have already done on six occasions. JA13021–24 (McCrudden, ¶¶ 22, 26–31). Put simply, the record reveals no realistic prospect that an order of the ECHR would secure payment from Poland where **Poland's own courts** have failed to secure it. Yet another unenforceable court order—this time from an international court with no enforcement powers (and which Poland has a history of failing to comply with, JA12785, Poland Country Profile,

ECtHR, ECF 29-9 at 11; *see also* JA13023–24 McCrudden, ¶¶ 30–31)—requesting that Poland pay what it owes, is even less of a remedy than the Polish court orders that the Arbitral Tribunal already found were ineffectual to the point of resulting in a violation of treaty-based investment protections. The theoretical availability of what amounts to a declaratory judgment is not a meaningful remedy, particularly where Mercuria would be required—after **seventeen years** of attempting to resolve this dispute—to start anew, suffering considerable further delays and having to incur considerable additional legal expenses. JA8609 (Dashwood, ¶ 120); *see also Pemex*, 832 F.3d at 109-10.

Finally, the District Court's observation that Mercuria has not been "left out in the cold" because it is "still welcome in Polish courts," JA13499 (Slip Op, at 15), is cold comfort indeed. Of course Mercuria is still "welcome" to litigate in the Polish courts, but the fact remains that those courts have failed repeatedly compel the state to compensate Mercuria. Nothing in the record suggests that Mercuria's continued attempts to obtain judicial relief in Poland are likely to succeed, or that the tribunal's substantive finding that those attempts are likely to be futile is not accurate.

In sum, the District Court erred by finding that the Svea Court's decision does not leave Mercuria without a remedy, and ignored large swathes of the record demonstrating that that is the case.

**E. The Award is Clearly Subject to Recognition Under U.S. Arbitration Law and the Svea Decision Is Contrary to the U.S. Policy Favoring International Arbitration**

While not one of the *Pemex* policy factors, the District Court's decision to enforce the Svea Decision and refuse recognition of the Award clearly thwarts the U.S. policy favoring enforcement of international arbitration awards, a policy that is both robust and well established. *See, e.g., Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530, 533 (2012) (quoting *Mitsubishi Motors* and affirming the "emphatic federal policy in favor of arbitral dispute resolution"); *Mitsubishi*, 473 U.S. at 631; *see also Compañía*, 58 F.4th at 461 (noting "'emphatic federal policy in favor of arbitral dispute resolution that 'applies with special force in the field of international commerce.'" (citing *Mitsubishi*, 473 U.S. at 631). Congress implemented the New York Convention with an expressly pro-enforcement mandate: a court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

But for the Svea Decision, there is no question that Mercuria's Award would be subject to enforcement in this country. Indeed, had the District Court addressed the Article V(1)(a) arguments raised by the Parties, it would undoubtedly have concluded that, under established Circuit law, there was a valid arbitral agreement between them. *Chevron*, 795 at F.3d at 207–08. The ECT provides written,

unconditional consent to arbitration in Article 26; directs tribunals to decide disputes under "this Treaty and applicable rules and principles of international law" in Article 26(6); and contains no intra-EU carve-out or disconnection clause. JA694, 701 (ECT Arts. 16, 26(3), 26(6)). The tribunal here—like every non-EU court to hear an intra-EU arbitration recognition matter, and like virtually every other decision maker other than EU organs and its Member States—applied those provisions as written and rejected the Intra-EU Objection on the merits, concluding that consent existed and that EU internal law could not negate a multilateral treaty obligation governed by international law. JA60, JA81, JA113 (Award ¶¶ 163-64, 247, 356-57).

*NextEra* confirms this conclusion under U.S. law. In holding that the intra-EU objection goes, at most, to the "scope, not the existence" of consent under ECT Article 26, this Court confirmed that the validity of the arbitration agreement here was a question for the arbitral tribunal that would not be subject to judicial review in the District Court, *see Stileks*, 985 F.3d at 878–79 and noted that the "powerful reasons" why the Treaty's standing offer embraces EU investors in disputes with EU Member States confirms that the tribunal's analysis was substantively correct. *NextEra*, 112 F.4th at 1102.

As noted above, this is not a case where an award was annulled as a result of an unclear arbitration clause, a procedural error, party or arbitrator misconduct, or any other ground related to the conduct of the arbitral proceeding. In such cases, the

extension of comity to a foreign set-aside order makes sense; the New York Convention system accords supervisory authority to national courts at the seat to police the arbitral process in accordance with their national arbitration law, because that is precisely what the parties bargained for. *E.g., Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997). In such a case, the District Court's comments about "superintending" foreign courts in their handling of local law and "armchair quarterbacking" would ring true.

The same cannot be said about this case. Here, it is clear that an otherwise spotless arbitration—or, more accurately, and entire class of claims—has been politically attacked and repudiated, and judicially annulled, based on an unmistakable policy shift by the EU, whose Member States have faced a deluge of claims under an arbitration provision that is, Mercuria respectfully submits, not the slightest bit ambiguous. The District Court claimed that it "squints in vain" to see any parallels between the Mexican reaction to the *Pemex* award and EC's reaction to the far larger collection of liabilities its states are facing under the ECT, *see* JA2977-78 (Slip Op, at 13–14), but Mercuria suggests that no squinting is required. In just the past 5 years, the EU and various of its Member States (including Poland) have formally withdrawn from the ECT, and did so only after their attempts to "modernize" the ECT by eliminating the possibility of intra-EU arbitrations (something that would be unnecessary if, as Poland, the Svea Court, and the EC concluded, such arbitrations

were "never agreed to") failed. JA1048-49 (Bjorklund ¶ 41).  As noted above, this Court need not disagree with the Svea Court or the CJEU on the outcomes they reached in order to refuse to give them effect in the United States.  The decisions that those courts make are within their sovereign prerogative.  The question is whether those decisions—resulting as they surely will in consequences that are unacceptable as a matter of U.S. law and policy—deserve the United States' seal of approval.  They do not, and this Court should reverse.

Finally, Mercuria notes that if this Court were to refuse to defer to the Svea Court decision, it would stand in respectable company.  To date, courts in the United Kingdom, Australia, Switzerland, New Zealand, and, most recently, Singapore have recognized and enforced investment arbitration awards against EU Member States in the face of intra-EU Objections. JA1088, JA1089, JA1090 (Bjorklund ¶¶ 147, 149, 153).  This Court should reverse and do the same.

## III.  THE DISTRICT COURT ERRED IN CONCLUDING THAT A FINDING OF "PROTECTIONISM" IS NECESSARY TO ENFORCE AN AWARD NOTWITHSTANDING SET-ASIDE

Finally, the District Court erred in suggesting that *Pemex* was inapposite because it turned on "protectionist undertones." JA2977-78 (Slip Op. 13–14). That is not what *Pemex* held.  Nothing in *Pemex* makes a finding of "protectionism" a prerequisite to enforcing an award notwithstanding a foreign set-aside, nor is there any hint of such a requirement in the decisions of this Court.

As discussed above, the Second Circuit in *Pemex* enforced the award because "powerful considerations" of U.S. public policy outweighed notions of comity. *Pemex*, 832 F.3d at 107. As the court emphasized, its decision turned on the vindication of strong U.S. public-policy interests—not on opposition to "protectionism." *See id.* at 106–12.

The facts the Second Circuit recounted confirm the point. In that case, the investor had already obtained its award when Mexico's courts, applying a new jurisdiction-stripping law retroactively, annulled it. The Second Circuit did not, however, condemn Mexico for protectionism. It condemned the retroactive nullification of an agreed arbitral forum and the resulting denial of a meaningful remedy, as well as Mexico's confiscation of property, because those outcomes offend U.S. policy. *Id.* at 107–12 (stressing reliance on an extant arbitration agreement, repudiation of a sovereign's undertaking to arbitrate, and the "imperative of having cases heard—somewhere"). The District Court's "protectionist undertones" gloss therefore misreads *Pemex* and improperly narrows the US-law comity analysis under the New York Convention.

But even if a showing of protectionism were required (it is not), the record here demonstrates similar undertones. The record of this case reflects that by 2018, EU Member States were facing a steady stream of ECT claims and monetary awards, leading the EC to embark on a political project to eliminate intra-EU arbitration.

After *Achmea*, member state declarations and EC communications urged national courts to refuse recognition of intra-EU awards and to terminate intra-EU investment treaties. JA7361 (Bjorklund ¶¶ 82–91). The EC then intensified a coordinated strategy, pressing national authorities—including Sweden—to align domestic practice with the EC's position, under threat of enforcement proceedings. *Id.*

That campaign culminated in *Komstroy*, where the CJEU, in a preliminary ruling that did not even involve an intra-EU investment dispute, pronounced— outside the *ratio decidendi*—that ECT Article 26 is incompatible with EU law for intra-EU disputes. National courts within the EU, including the Swedish Court in this case, were then compelled to treat *Komstroy* as dispositive and to annul intra-EU ECT awards. JA12592– 12603 (Svea Judgment at 4–15).

The broader context is equally telling: As EU Member States lost ECT cases, the Commission and certain Member States pursued a political exit—statements of withdrawal and a "modernization" initiative designed to neutralize intra-EU arbitration—while urging national courts to prevent enforcement of intra-EU awards in the interim. JA7361 (Bjorklund ¶¶ 86–91). That sequence—adverse awards, coordinated institutional pressure, extra-textual reinterpretation of a multilateral treaty to which non-EU actors are party, and dogged, systematic efforts to block recognition—reads by any sensible measure as a coordinated attempt by EU

institutions to favor its Member States over individual investors and terminate *de facto* a multilateral treaty that no longer suited it.

The District Court erred twice: First, by imposing a protectionism predicate; and second, by overlooking the evidence that EU institutions pursued, and national courts implemented, a politically driven effort to eliminate intra-EU arbitration and to defeat enforcement of resulting awards. In short, neither *Pemex* nor any decision of this Circuit requires proof of "protectionist undertones" to enforce an award that has been annulled, but Mercuria submits that the record here would satisfy that requirement even if this Court were to adopt or accept it.

\* \* \* \*

Comity does not oblige U.S. courts to ratify the EU's political goals at the expense of U.S. public policy, or the New York Convention's pro-enforcement mandate. *See Parsons & Whittemore Overseas Co. v. Societe Generale de l'Industrie du Papier*, 508 F.2d 969, 974 (2d Cir. 1974); *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 250 (D.D.C. 2015). The judgment should be reversed.

# CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the District Court.

Dated: January 21, 2026

Respectfully submitted,

*/s/ James E. Berger*
James E. Berger
Charlene Sun
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212-335-4500
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com

*Counsel for Petitioner-Appellant*
*Mercuria Energy Group Limited*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 12,832 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1); and

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally-spaced serif typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ James E. Berger*
James E. Berger
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212-335-4500
james.berger@us.dlapiper.com

*Counsel for Petitioner-Appellant*
*Mercuria Energy Group Limited*

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(b) and Circuit Rule 25(f), I hereby certify that on January 21, 2026, I caused this foregoing brief and following addendum to be filed electronically with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and the CM/ECF system will accomplish service.

 */s/ James E. Berger*
James E. Berger
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212-335-4500
james.berger@us.dlapiper.com

*Counsel for Petitioner-Appellant*
*Mercuria Energy Group Limited*

# Addendum

United States Code Annotated
  Title 9. Arbitration (Refs & Annos)
    Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 201

§ 201. Enforcement of Convention

Currentness

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 692.)

9 U.S.C.A. § 201, 9 USCA § 201
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Proposed Legislation

United States Code Annotated
  Title 9. Arbitration (Refs & Annos)
    Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 208

§ 208. Application

Effective: March 3, 2022
Currentness

Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States. This chapter applies to the extent that this chapter is not in conflict with chapter 4.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 693; amended Pub.L. 117-90, § 2(b)(1)(B), Mar. 3, 2022, 136 Stat. 27.)

9 U.S.C.A. § 208, 9 USCA § 208
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
 Title 9. Arbitration (Refs & Annos)
  Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 207

§ 207. Award of arbitrators; confirmation; jurisdiction; proceeding

Currentness

Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 693.)

9 U.S.C.A. § 207, 9 USCA § 207
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document** 		© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 9. Arbitration (Refs & Annos)
    Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 206

§ 206. Order to compel arbitration; appointment of arbitrators

Currentness

A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 693.)

9 U.S.C.A. § 206, 9 USCA § 206
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

---

**End of Document** <span style="float:right">© 2026 Thomson Reuters. No claim to original U.S. Government Works.</span>

United States Code Annotated
  Title 9. Arbitration (Refs & Annos)
    Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 205

§ 205. Removal of cases from State courts

Currentness

Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 692.)

9 U.S.C.A. § 205, 9 USCA § 205
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 9. Arbitration (Refs & Annos)
    Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 204

§ 204. Venue

Currentness

An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 692.)

9 U.S.C.A. § 204, 9 USCA § 204
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 9. Arbitration (Refs & Annos)
    Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 203

§ 203. Jurisdiction; amount in controversy

Currentness

An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 692.)

9 U.S.C.A. § 203, 9 USCA § 203
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Unconstitutional or Preempted  Limitation Recognized by   Foresight Energy, LLC v. Certain London Market Insurance Companies,   E.D.Mo.,   Apr. 25, 2018

United States Code Annotated
   Title 9. Arbitration (Refs & Annos)
      Chapter 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (Refs & Annos)

9 U.S.C.A. § 202

§ 202. Agreement or award falling under the Convention

Currentness

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

**CREDIT(S)**

(Added Pub.L. 91-368, § 1, July 31, 1970, 84 Stat. 692.)

9 U.S.C.A. § 202, 9 USCA § 202
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document** 

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Proposed Legislation

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1291

§ 1291. Final decisions of district courts

Currentness

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 48, 65 Stat. 726; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 97-164, Title I, § 124, Apr. 2, 1982, 96 Stat. 36.)

28 U.S.C.A. § 1291, 28 USCA § 1291
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1330

§ 1330. Actions against foreign states

Currentness

**(a)** The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

**(b)** Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

**(c)** For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.

**CREDIT(S)**

(Added Pub.L. 94-583, § 2(a), Oct. 21, 1976, 90 Stat. 2891.)

28 U.S.C.A. § 1330, 28 USCA § 1330
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**T.I.A.S. No. 6997 (U.S. Treaty), 21 U.S.T. 2517 (U.S. Treaty), 1970 WL 104417 (U.S. Treaty)**

UNITED STATES OF AMERICA

Multilateral

**Recognition and Enforcement of Foreign Arbitral Awards** [1]

[1]     For note by the Department of State, see p. 2561.

Convention done at New York June 10, 1958; [2]

[2]     Texts as certified by the Secretary-General of the United Nations.

Accession, with declarations, advised by the Senate of the United States of America October 4, 1968;
Accession, with said declarations, approved by the President of the United States of America September 1, 1970;
Accession of the United States of America, with said declarations, deposited
with the Secretary-General of the United Nations September 30, 1970;
Proclaimed by the President of the United States of America December 11, 1970;
Entered into force with respect to the United States of America December 29, 1970.
December 29, 1970.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

**UNITED NATIONS CONFERENCE ON INTERNATIONAL COMMERCIAL ARBITRATION**

**CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS**

*Article I*

*Article II*

*Article III*

*Article IV*

*Article V*

*Article VI*

*Article VII*

*Article VIII*

*Article IX*

*Article X*

*Article XI*

*Article XII*

*Article XIII*

*Article XIV*

*Article XV*

*Article XVI*

**Note by the Department of State**

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

**\*1**  CONSIDERING THAT:

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards was adopted at New York on June 10, 1958, the text of which is as follows:

UNITED NATIONS CONFERENCE ON INTERNATIONAL COMMERCIAL ARBITRATION

CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

*Article I*

1. This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

2. The term "arbitral awards" shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted.

3. When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration. [3]

³    For note by the Department of State, see p. 2561.

#### *Article II*

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

#### *Article III*

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

#### *Article IV*

**\*2**  1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:

(*a*) The duly authenticated original award or a duly certified copy thereof;

(*b*) The original agreement referred to in article II or a duly certified copy thereof.

2. If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for recognition and enforcement of the award shall produce a translation of these documents into such language. The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent.

#### *Article V*

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(*a*) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(*b*) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(*c*) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(*d*) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(*e*) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(*a*) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(*b*) The recognition or enforcement of the award would be contrary to the public policy of that country.

## *Article VI*

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V (1) (*e*), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

## *Article VII*

**\*3**  1. The provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States nor deprive any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon.

2. The Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention on the Execution of Foreign Arbitral Awards of 1927[4] shall cease to have effect between Contracting States on their becoming bound and to the extent that they become bound, by this Convention.

[4]     27 LNTS 157; 92 LNTS 301.

## *Article VIII*

1. This Convention shall be open until 31 December 1958 for signature on behalf of any Member of the United Nations and also on behalf of any other State which is or hereafter becomes a member of any specialized agency of the United Nations, or which

is or hereafter becomes a party to the Statute of the International Court of Justice,[5] or any other State to which an invitation has been addressed by the General Assembly of the United Nations.

[5]      TS 993; 59 Stat. 1055.

2. This Convention shall be ratified and the instrument of ratification shall be deposited with the Secretary-General of the United Nations.

### Article IX

1. This Convention shall be open for accession to all States referred to in article VIII.

2. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

### Article X

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

### Article XI

In the case of a federal or non-unitary State, the following provisions shall apply:

 **\*4**  (*a*) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal authority, the obligations of the federal Government shall to this extent be the same as those of Contracting States which are not federal States;

(*b*) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent states or provinces which are not, under the constitutional system of the federation, bound to take legislative action, the federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of constituent states or provinces at the earliest possible moment;

(*c*) A federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the federation and its constituent units in regard to any particular provision of this Convention, showing the extent to which effect has been given to that provision by legislative or other action.

### Article XII

1. This Convention shall come into force on the ninetieth day following the date of deposit of the third instrument of ratification or accession.

2. For each State ratifying or acceeding to this Convention after the deposit of the third instrument of ratification or accession, this Convention shall enter into force on the ninetieth day after deposit by such State of its instrument of ratification or accession.

## Article XIII

1. Any Contracting State may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation shall take effect one year after the date of receipt of the notification by the Secretary-General.

2. Any State which has made a declaration or notification under article X may, at any time thereafter, by notification to the Secretary-General of the United Nations, declare that this Convention shall cease to extend to the territory concerned one year after the date of the receipt of the notification by the Secretary-General.

3. This Convention shall continue to be applicable to arbitral awards in respect of which recognition or enforcement proceedings have been instituted before the denunciation takes effect.

## Article XIV

A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention.

## Article XV

The Secretary-General of the United Nations shall notify the States contemplated in article VIII of the following:

(*a*) Signatures and ratifications in accordance with article VIII;

(*b*) Accessions in accordance with article IX;

(*c*) Declarations and notifications under articles I, X and XI;

(*d*) The date upon which this Convention enters into force in accordance with article XII;

 **\*5** (*e*) Denunciations and notifications in accordance with article XIII.

## Article XVI

1. This Convention, of which the Chinese, English, French, Russian and Spanish texts shall be equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit a certified copy of this Convention to the States contemplated in article VIII.

FOR AFGHANISTAN:

FOR ALBANIA:

FOR ARGENTINA:

Subject to the declaration contained in the Final Act.

C. RAMOS
26 August 1958

FOR AUSTRALIA:

FOR AUSTRIA:

FOR THE KINGDOM OF BELGIUM:

Joseph NISOT
A. HERMENT

FOR BOLIVIA:

FOR BRAZIL:

FOR BULGARIA:

Bulgaria will apply the Convention to recognition and enforcement of awards made in the territory of another contracting State. With regard to awards made in the territory of non-contracting States it will apply the Convention only to the extent to which these States grant reciprocal treatment.

A. GHEORGIEV
17 XII 1958

FOR THE UNION OF BURMA:

FOR THE BYELORUSSIAN SOVIET SOCIALIST REPUBLIC:

F. N. GRYAZNOV
29/XII-1958


**FOR CAMBODIA:**


**FOR CANADA:**


**FOR CEYLON:**


M. T. D. KANAKARATNE
December 30th, 1958


**FOR CHILE:**


**FOR CHINA:**


**FOR COLOMBIA:**


**FOR COSTA RICA:**


Alberto F. CAÑAS


**FOR CUBA:**


**FOR CZECHOSLOVAKIA:**


Czechoslovakia will apply the Convention to recognition and enforcement of awards made in the territory of another contracting State. With regard to awards made in the territory of non-contracting States it will apply the Convention only to the extent to which these states grant reciprocal treatment.


Jaroslav PSC̆OLKA
October 3, 1958


**FOR DENMARK:**


**FOR THE DOMINICAN REPUBLIC:**


**FOR ECUADOR:**

José A. CORREA
Dec 17/1958

**FOR EL SALVADOR:**

M. Rafael URQUÍA
F. R. LIMA

**FOR ETHIOPIA:**

**FOR THE FEDERATION OF MALAYA:**

**FOR FINLAND:**

G. A. GRIPENBERG
Dec. 29th, 1958

**FOR FRANCE:**

G. GEORGES-PICOT
25 November 1958

**FOR THE FEDERAL REPUBLIC OF GERMANY:**

A. BULOW

**FOR GHANA:**

**FOR GREECE:**

**FOR GUATEMALA:**

**FOR HAITI:**

**FOR THE HOLY SEE:**

**FOR HONDURAS:**

**FOR HUNGARY:**

**FOR ICELAND:**

**FOR INDIA:**

C. K. DAPHTARY

**FOR INDONESIA:**

**FOR IRAN:**

**FOR IRAQ:**

**FOR IRELAND:**

**FOR ISRAEL:**

H. COHN

**FOR ITALY:**

**FOR JAPAN:**

**FOR THE HASHEMITE KINGDOM OF JORDAN:**

Thabet KHALIDI

**FOR THE REPUBLIC OF KOREA:**

**FOR LAOS:**

**FOR LEBANON:**

**FOR LIBERIA:**

**FOR LIBYA:**

**FOR LIECHTENSTEIN:**

**FOR THE GRAND DUCHY OF LUXEMBOURG:**

Georges HEISBOURG
Le 11 novembre 1958

**FOR MEXICO:**

**FOR MONACO:**

Marcel PALMARO
Le 31/12/58

**FOR MOROCCO:**

**FOR NEPAL:**

**FOR THE KINGDOM OF THE NETHERLANDS:**

C. SCHURMANN

**FOR NEW ZEALAND:**

**FOR NICARAGUA:**

**FOR THE KINGDOM OF NORWAY:**

**FOR PAKISTAN:**

K. M. KAISER
30th of December 1958

**FOR PANAMA:**

**FOR PARAGUAY:**

**FOR PERU:**

**FOR THE PHILIPPINE REPUBLIC:**

Octavio L. MALOLES

The Philippine delegation signs *ad referendum* this Convention with the reservation that it does so on the basis of reciprocity and declares that the Philippines will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State pursuant to article I, paragraph 3, of the Convention.

<br>

**FOR POLAND:**

Jacek MACHOWSKI

With reservations as mentioned in article I, par. 3.

<br>

**FOR PORTUGAL:**

**FOR ROMANIA:**

**FOR SAN MARINO:**

**FOR SAUDI ARABIA:**

**FOR SPAIN:**

**FOR THE SUDAN:**

**FOR SWEDEN:**

Agda RÖSSEL
Dec. 23, 1958

<br>

**FOR SWITZERLAND:**

Felix SCHNYDER
29 décembre 1958

<br>

**FOR THAILAND:**

**FOR TUNISIA:**

**FOR TURKEY:**

**FOR THE UKRAINIAN SOVIET SOCIALIST REPUBLIC:**

P. P. UDOVICHENKO
29.XII.1958

**FOR THE UNION OF SOUTH AFRICA:**

**FOR THE UNION OF SOVIET SOCIALIST REPUBLICS:**

A. A. SOBOLEV
29-XII-58

**FOR THE UNITED ARAB REPUBLIC:**

**FOR THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND:**

**FOR THE UNITED STATES OF AMERICA:**

**FOR URUGUAY:**

**FOR VENEZUELA:**

**FOR VIET-NAM:**

**FOR YEMEN:**

**FOR YUGOSLAVIA:**

By its resolution of October 4, 1968, the Senate of the United States of America, two-thirds of the Senators present concurring, gave its advice and consent to accession to the Convention with the following declarations:

"The United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State."

"The United States of America will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States."

The accession of the United States of America to the Convention was approved by the President of the United States of America with the aforesaid declarations on September 1, 1970, and the instrument of accession was deposited with the Secretary-General of the United Nations on September 30, 1970;

In accordance with paragraph 2 of Article XII, the Convention will enter into force for the United States of America on December 29, 1970, the ninetieth day after the deposit of its instrument of accession;

In accordance with paragraph 2 of Article X and pursuant to a notification by the Government of the United States of America received by the Secretary-General of the United Nations on November 3, 1970, the application of the aforesaid Convention will extend, with effect from February 1, 1971, to all the territories for the international relations of which the United States of America is responsible;

NOW, THEREFORE, I, Richard Nixon, President of the United States of America, proclaim and make public the Convention on the Recognition and Enforcement of Foreign Arbitral Awards to the end that, subject to the aforesaid declarations, it shall be observed and fulfilled, as to the United States of America on and after December 29, 1970, and as to all the territories for the international relations of which the United States of America is responsible on and after February 1, 1971, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.
DONE at the city of Washington this eleventh day of December in the year of our Lord one thousand nine hundred seventy and of the Independence of the United States of America the one hundred ninety-fifth.

[SEAL]
RICHARD NIXON

**By the President:**
WILLIAM P ROGERS
*Secretary of State*

### Note by the Department of State

List of countries parties to the convention as of December 29, 1970, with texts of declarations and reservations made at the time of signature of the convention or deposit of the instrument of ratification or accession.

| Country | Date of deposit of ratification or accession (a) |
| --- | --- |
| Austria ——————————————————— | May 2, 1961(a) |
| The Republic of Austria will apply the Convention, | |
| in accordance with the first sentence | |
| of article I(3) thereof, only to the recognition | |
| and enforcement of arbitral awards | |
| made in the territory of another Contracting | |
| State. [Translation] | |
| Bulgaria ——————————————————— | October 10, 1961 |
| Bulgaria will apply the Convention to recognition | |
| and enforcement of awards made in the | |

territory of another contracting State. With regard to awards made in the territory of non-contracting States it will apply the Convention only to the extent to which these States grant reciprocal treatment. [Translation]

| | |
|---|---|
| Byelorussian Soviet Socialist Republic —— The Byelorussian Soviet Socialist Republic will apply the provisions of this Convention in respect to arbitral awards made in the territories of non-contracting States only to the extent to which they grant reciprocal treatment. [Translation] | November 15, 1960 |
| Cambodia ————————————— | January 5, 1960(a) |
| Central African Republic ——————— Referring to the possibility offered by paragraph 3 of article I of the Convention, the Central African Republic declares that it will apply the Convention on the basis of reciprocity, to the recognition and enforcement of awards made only in the territory of another contracting State; it further declares that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under its national law. [Translation] | October 15, 1962(a) |
| Ceylon ————————————— | April 9, 1962 |
| Czechoslovakia ————————— | July 10, 1959 |

"Czechoslovakia will apply the Convention to recognition and enforcement of awards made in the territory of another contracting State. With regard to awards made in the territory of non-contracting States it will apply the Convention only to the extent to which these States grant reciprocal treatment."

Ecuador ———————————————— January 3, 1962

Ecuador, on the basis of reciprocity, will apply the Convention to the recognition and enforcement of arbitral awards made in the territory of another contracting State only if such awards have been made with respect to differences arising out of legal relationships which are regarded as commercial under Ecuadorean law. [Translation]

Finland ———————————————— January 19, 1962

France [6] ———————————————— June 26, 1959

Referring to the possibility offered by paragraph 3 of article I of the Convention, France declares that it will apply the Convention on the basis of reciprocity, to the recognition and enforcement of awards made only in the territory of another contracting State; it further declares that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial

under its national law. [Translation]

Germany, Federal Republic of [7] ———— June 30, 1961

"With respect to paragraph 1 of article I, and

in accordance with paragraph 3 of article I

of the Convention, the Federal Republic of

Germany will apply the Convention only to

the recognition and enforcement of awards

made in the territory of another Contracting

State."

Ghana ———————————— April 9, 1968(a)

Greece ———————————— July 16, 1962(a)

Hungary ——————————— March 5, 1962(a)

". . . the Hungarian People's Republic shall

apply the Convention to the recognition and

enforcement of such awards only as have

been made in the territory of one of the other

Contracting States and are dealing with

differences arising in respect of a legal relationship

considered by the Hungarian law as

a commercial relationship."

India ——————————————— July 13, 1960

"In accordance with Article I of the Convention,

the Government of India declare that

they will apply the Convention to the recognition

and enforcement of awards made only

in the territory of a State, party to this Convention.

They further declare that they will

apply the Convention only to differences

arising out of legal relationships, whether

contractual or not, which are considered as commercial under the Law of India."

| | |
|---|---|
| Israel ————————————— | January 5, 1959 |
| Italy ————————————— | January 31, 1969(a) |
| Japan ————————————— | June 20, 1961(a) |

". . . it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State."

| | |
|---|---|
| Malagasy Republic ———————— | July 16, 1962(a) |

The Malagasy Republic declares that it will apply the Convention on the basis of reciprocity, to the recognition and enforcement of awards made only in the territory of another Contracting State; it further declares that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under its national law. [Translation]

| | |
|---|---|
| Morocco ————————————— | February 12, 1959(a) |

The Government of His Majesty the King of Morocco will only apply the Convention to the recognition and enforcement of awards made only in the territory of another contracting State. [Translation]

| | |
|---|---|
| Netherlands [8] ————————— | April 24, 1964 |

Referring to paragraph 3 of article I of the

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, the Government of the Kingdom declares that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State.

[Translation]

Niger ——————————————— October 14, 1964(a)

Nigeria ——————————————— March 17, 1970(a)

"In accordance with paragraph 3 of article I of the Convention, the Federal Military Government of the Federal Republic of Nigeria declares that it will apply the Convention on the basis of reciprocity to the recognition and enforcement of awards made only in the territory of a State party to this Convention and to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the Laws of the Federal Republic of Nigeria."

Norway ——————————————— March 14, 1961(a)

"1. We will apply the Convention only to the recognition and enforcement of awards made in the territory of one of the Contracting States."

"2. We will not apply the Convention to differences where the subject matter of the proceedings is immovable property situated in

Norway, or a right in or to such property."

Philippines ———————————————— July 6, 1967

". . . the Philippines, on the basis of reciprocity,

will apply the Convention to the

recognition and enforcement of awards made

only in the territory of another Contracting

State and only to differences arising out of

legal relationships, whether contractual or

not, which are considered as commercial

under the national law of the State making

such declaration."

Poland ———————————————— October 3, 1961

"With reservations as mentioned in article I,

par. 3."

Romania ———————————————— September 13, 1961(a)

The Romanian People's Republic will apply

the Convention only to differences arising out

of legal relationships, whether contractual or

not, which are considered as commercial under

its legislation.

The Romanian People's Republic will apply

the Convention to the recognition and enforcement

of awards made in the territory of

another Contracting State. As regards

awards made in the territory of certain non-contracting

States, the Romanian People's

Republic will apply the Convention only on

the basis of reciprocity established by joint

agreement between the parties. [Translation]

Switzerland ——————————————— June 1, 1965

Referring to the possibility offered by paragraph 3 of article I, Switzerland will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. [Translation]

Syria ——————————————— March 9, 1959(a)

Tanzania ——————————————— October 13, 1964(a)

"The Government of the United Republic of Tanganyika and Zanzibar will apply the Convention, in accordance with the first sentence of article 1(3) thereof, only to the recognition and enforcement of awards made in the territory of another Contracting State."

Thailand ——————————————— December 21, 1959(a)

Trinidad and Tobago ——————————— February 14, 1966(a)

"In accordance with Article I of the Convention, the Government of Trinidad and Tobago declares that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. The Government of Trinidad and Tobago further declares that it will apply the Convention only to differences arising out of legal relationships, whether contracted or not, which are considered as commercial under the Law of Trinidad and Tobago."

| | |
|---|---|
| Tunisia ———————————— | July 17, 1967(a) |

. . . with the reservations provided for in article I, paragraph 3, of the Convention, that is to say, the Tunisian State will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State and only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under Tunisian law. [Translation]

| | |
|---|---|
| Ukranian Soviet Socialist Republic ——— | October 10, 1960 |

The Ukrainian Soviet Socialist Republic will apply the provisions of this Convention in respect to arbitral awards made in the territories of non-contracting States only to the extent to which they grant reciprocal treatment. [Translation]

| | |
|---|---|
| Union of Soviet Socialist Republics ——— | August 24, 1960 |

The Union of Soviet Socialist Republics will apply the provisions of this Convention in respect to arbitral awards made in the territories of non-contracting States only to the extent to which they grant reciprocal treatment. [Translation]

| | |
|---|---|
| United Arab Republic ——————————— | March 9, 1959(a) |
| United States of America [9] ————————— | September 30, 1970(a) |

"The United States of America will apply the Convention, on the basis of reciprocity, to

the recognition and enforcement of only those

awards made in the territory of another

Contracting State."

"The United States of America will apply the

Convention only to differences arising out of

legal relationships, whether contractual or

not, which are considered as commercial

under the national law of the United States."

[6] Extended to all territories of the French Republic.

[7] Applicable to Land Berlin.

[8] Applicable to the Kingdom in Europe, Surinam and the Netherlands Antilles.

[9] Extended to all the territories for the international relations of which the United States of America is responsible, with effect from Feb. 1, 1971.

T.I.A.S. No. 6997

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1605

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

Effective: December 16, 2016
Currentness

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

**(1)** in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

**(2)** in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

**(3)** in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

**(4)** in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

**(5)** not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to--

**(A)** any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

**(B)** any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

**(6)** in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

**(b)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That--

**(1)** notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

**(2)** notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

**(c)** Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

**(d)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

[**(e), (f)** Repealed. Pub.L. 110-181, Div. A, Title X, § 1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341.]

**(g) Limitation on discovery.--**

**(1) In general.--(A)** Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A or section 1605B, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

**(B)** A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

**(2) Sunset.--(A)** Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

**(B)** After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would--

**(i)** create a serious threat of death or serious bodily injury to any person;

**(ii)** adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

**(iii)** obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

**(3) Evaluation of evidence.--**The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

**(4) Bar on motions to dismiss.--**A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

**(5) Construction.--**Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

**(h) Jurisdictional immunity for certain art exhibition activities.--**

**(1) In general.--**If--

**(A)** a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

**(B)** the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)), that such work is of cultural significance and the temporary exhibition or display of such work is in the national interest; and

**(C)** the notice thereof has been published in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)),

any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

**(2) Exceptions.**--

**(A) Nazi-era claims.**--Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and--

**(i)** the property at issue is the work described in paragraph (1);

**(ii)** the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

**(iii)** the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

**(iv)** a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(B) Other culturally significant works.**--In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and--

**(i)** the property at issue is the work described in paragraph (1);

**(ii)** the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

**(iii)** the taking occurred after 1900;

**(iv)** the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

**(v)** a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(3) Definitions.**--For purposes of this subsection--

**(A)** the term "work" means a work of art or other object of cultural significance;

**(B)** the term "covered government" means--

**(i)** the Government of Germany during the covered period;

**(ii)** any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

**(iii)** any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

**(iv)** any government in Europe that was an ally of the Government of Germany during the covered period; and

**(C)** the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.

## CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 100-640, § 1, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 2, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(8), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(a), Apr. 24, 1996, 110 Stat. 1241; Pub.L. 105-11, Apr. 25, 1997, 111 Stat. 22; Pub.L. 107-77, Title VI, § 626(c), Nov. 28, 2001, 115 Stat. 803; Pub.L. 107-117, Div. B, § 208, Jan. 10, 2002, 115 Stat. 2299; Pub.L. 109-304, § 17(f)(2), Oct. 6, 2006, 120 Stat. 1708; Pub.L. 110-181, Title X, § 1083(b)(1), Jan. 28, 2008, 122 Stat. 341; Pub.L. 114-222, § 3(b)(2), Sept. 28, 2016, 130 Stat. 853; Pub.L. 114-319, § 2(a), Dec. 16, 2016, 130 Stat. 1618.)

28 U.S.C.A. § 1605, 28 USCA § 1605
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.