**NOT YET SCHEDULED FOR ORAL ARGUMENT**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-7152**

MERCURIA ENERGY GROUP LIMITED,

*Petitioner-Appellant,*

*v.*

REPUBLIC OF POLAND,

*Respondent-Appellee.*

*On Appeal from the Decision of the United States District Court
for the District of Columbia in No. 1:23-cv-03572-TNM,
Hon. Trevor N. McFadden, U.S. District Judge*

**REPLY BRIEF FOR PETITIONER-APPELLANT**

JAMES E. BERGER
CHARLENE SUN
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com

*Counsel for Petitioner-Appellant*

May 28, 2026

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ..................................................................................................3

   I.   This Court Should Review the District Court's Decision *De Novo* .................3

   II.  Poland Admits the *TermoRio* Standard Governs This Appeal but
       Misrepresents It ..................................................................................................5

   III. The *TermoRio* Test, as Applied in *Pemex*, Mandates Reversal ......................8

       A.   The District Court Erred in Deferring to the Svea Decision Because It
            Nullified Mercuria's Contractual Right to Arbitrate ................................9

       B.   The District Court Erred in Deferring to the Svea Decision When It Was
            Based on a Retroactive Application of Law .............................................13

       C.   The District Court Erred in Deferring to the Svea Decision Because
            Mercuria's Property Has Been Effectively Expropriated ........................15

       D.   The District Court's Finding that Mercuria Has Not Been Left Without a
            Remedy Is Clearly Erroneous and Contrary to U.S. Law........................16

       E.   U.S. Public Policy Requires Enforcement of the Award.........................18

   IV. Poland's "Comity at Its Zenith" Argument Is Meritless ...............................19

   V.  Poland Misstates the Record Repeatedly .......................................................22

       A.   The First ECT Arbitration..............................................................................22

       B.   Poland Misrepresents the Facts Concerning Sweden as a Venue............23

       C.   Poland's "Eyes Wide Open" Narrative, Accepted by the District Court, Is
            Clearly Contradicted by the Record........................................................24

CONCLUSION..............................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BG Group PLC v. Rep. of Argentina*,
572 U.S. 25 (2014)................................................................................11, 12

*Blasket Renewable Invs. LLC v. Kingdom of Spain*,
No. 20-1081, 2025 WL 3516146 (D.D.C. Sept. 11, 2025) ..............................19

*Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de
Chihuahua S.A.B. de C.V.*,
58 F.4th 429 (10th Cir. 2023) .................................................................6, 19

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.
v. Pemex Exploración y Producción*,
832 F.3d 92 (2d Cir. 2016) ............................... 3, 6, 7, 8, 13, 14, 15, 19

*Cube Infrastructure SICAV v. Kingdom of Spain*,
No. 20-1708, 2025 WL 2374517 (D.D.C. Aug. 14, 2025)................................19

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*,
40 F.4th 56 (2d Cir. 2022) ....................................................................3, 8, 9

*Getma Int'l v. Republic of Guinea*,
862 F.3d 45 (D.C. Cir. 2017)...............................................................4, 5, 18

*Hilton v. Guyot*,
159 U.S. 113 (1895)..................................................................................21

*Kingdom of Spain v. Blasket Renewable Investments LLC*,
No. 24-1130 (U.S.) ...........................................................................10, 11, 16

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984)......................................................................20

*LLC SPC Stileks v. Rep. of Moldova*,
985 F.3d 871 (D.C. Cir. 2021)..................................................................11, 17

*Medellín v. Texas*,
552 U.S. 491 (2008)....................................................................................11

ii

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)........................................................................21

*NextEra Energy Global Holdings B.V. v. Kingdom of Spain*,
    112 F.4th 1088 (D.C. Cir. 2024)...................................10, 19, 20, 25

*Republic of Moldova v. Komstroy*,
    EU:C:2021:655 (Sep. 2, 2021) ......................................................13

*Rivers v. Roadway Express*,
    511 U.S. 298 (1994)......................................................................13

*Slowakische Republik v. Achmea BV*,
    EU:C:2018:158 (Mar. 6, 2018).......................................................9

*TermoRio S.A. E.S.P. v. Electranta S.P.*
    487 F.3d 928 (D.C. Cir. 2007)............................................4, 5, 7, 21

*Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic
    Republic*,
    864 F.3d 172 (2d Cir. 2017) ...........................................................3

**Statutes**

28 U.S.C. § 1605(a)(6)...........................................................................12

**Other Authorities**

Convention on the Recognition and Enforcement of Foreign Arbitral
    Awards, opened for signature, June 10, 1958, 21 U.S.T. 2517, 330
    U.N.T.S. 38 ...........................................................................20, 21

United States *Amicus* Br. on Cert., *Kingdom of Spain v. Blasket
    Renewable Investments LLC*, No. 24-1130 (U.S.)................10, 11, 16

# **GLOSSARY**

("**CJEU**") Court of Justice of the European Union

("**EC**") European Commission

("**ECT**") Energy Charter Treaty

("**ECtHR**") European Court of Human Rights

("**EU**") European Union

("**First ECT Arbitration**") SCC arbitration in July 2008

("**ISDS**") Investor-State Dispute Settlement

("**New York Convention**") Convention on the Recognition and Enforcement of Foreign Arbitral Awards

("**SCC**") Arbitration Institute of the Stockholm Chamber of Commerce

("**Second ECT Arbitration**") SCC arbitration commenced on September 12, 2019

("**Svea Decision**") Decision by the Svea Court of Appeal in Stockholm

("**Svea Court**") Svea Court of Appeal in Stockholm

## <u>STATUTES AND REGULATIONS</u>

All applicable statutes and regulations are contained in the Addendum attached to the Opening Brief for Petitioner-Appellant.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This is a case about discretion and comity, and it presents a question as straightforward as it is significant: Is the United States willing to give its seal of approval to a foreign court decision that applies local European law to annul an entire class of investor arbitrations that were validly commenced under a multilateral treaty that calls for resolution of disputes under international law, and to which the European Union ("**EU**")—and several of its member states—are parties, but as to which the EU has had a change of heart?

The District Court answered that question in the affirmative, purporting to apply this Court's precedents to defer to a decision ("**Svea Decision**") by the Svea Court of Appeal ("**Svea Court**"), which was dictated by a decision of the Court of Justice of the European Union ("**CJEU**"), and to hold that Mercuria is not entitled to enforce its arbitration award against Poland. Its decision was misconceived and erroneous, and this Court should reverse.

As noted by Mercuria in its opening brief, the District Court's analysis erroneously focused on the procedural conduct of the Svea Court proceedings; satisfied that the Svea Court proceedings were not *themselves* marred by a lack of procedural due process or fairness, the District Court held it was obligated to refrain from "superintending" a European court's handling of "European law" issues, and by so focusing its analysis, failed to take sight of the CJEU's fundamental re-writing

of a multilateral treaty and the fact that its decision—dutifully implemented by the Svea Court—obliterated Mercuria's legitimate expectation to bring its claim against Poland under the Energy Charter Treaty ("**ECT**") before a neutral arbitration forum. Perhaps the clearest illustration of the District Court's flawed approach to this case can be seen in its statement that it was unwilling to find that "the EU's highest court and Sweden's highest court are wrong about EU law." JA13501. That was never the issue in this case, and the District Court's reliance on it demonstrates the erroneous path it followed.

Poland's brief does little more than parrot and double down on the District Court's analysis, focusing on the procedural hygiene of the Svea Decision and insisting that if that decision is sound on its face and not marred by any procedural irregularity, that neither it nor the circumstances surrounding it may be judged against the measuring stick of U.S. policy.

But that is wrong. U.S. courts are not required to—and indeed must not— subordinate U.S. public policy in deference to another country's judgments, however pristine the system under which those judgments were rendered, where doing so would result in the retroactive deprivation of a party's rights, the confiscation of its property, and its meritorious claims without a meaningful and effective forum for resolution (a result which the United States Solicitor General recently remarked was *precisely what was achieved* by the recent disavowals by European states like

Poland of their international law obligations). The Svea Decision—as the pre-ordained culmination of events orchestrated by the European Commission ("**EC**") in response to a class of claims it bitterly opposed—did each of these things to Mercuria. The District Court largely ignored the record evidence demonstrating each of these forms of prejudice to Mercuria, and Poland's brief, in service of championing the District Court's analysis, materially mischaracterizes that evidence as well as the governing legal standard in order to hide that prejudice from this Court's view.

The District Court's ruling amounted to blind deference to the Svea Court's annulment of Mercuria's Award. The District Court committed clear errors in its treatment of the factual record, and it applied the wrong legal test. This Court should reverse.

## ARGUMENT

### I.     This Court Should Review the District Court's Decision *De Novo*

Poland urges this Court to apply abuse-of-discretion review, relying on the Second Circuit's approach in *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 191 (2d Cir. 2017), *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 40 F.4th 56, 72 (2d Cir. 2022), and *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción*, 832 F.3d 92, 100 (2d Cir. 2016). Appellee Br. at 21. But

3

Poland does not dispute that this Court applied *de novo* review to the dismissal of an enforcement action in *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 932 (D.C. Cir. 2007).  And Poland concedes that this Court has "expressly refrained from establishing" (Appellee Br. at 21) a deferential standard of review where a district court declines to enforce an award on the basis of its set-aside at the seat.  *Getma Int'l v. Republic of Guinea*, 862 F.3d 45, 48 (D.C. Cir. 2017).

Where, as here, the District Court applied an erroneous legal framework—*de facto* reducing the public policy "repugnancy" standard to a mere procedural-fairness test and failing to properly engage with the facts showing repugnancy to U.S. public policy—*de novo* review is plainly appropriate.  The facts are largely undisputed; the crux of this appeal is the District Court's misapprehension of the legal consequence of those facts under governing law, making *de novo* review appropriate.[1]  *See TermoRio*, 487 F.3d at 932 (applying *de novo* review).  In any event, even under the abuse-of-discretion standard urged by Poland, the District Court's refusal to recognize the Award under the circumstances would constitute reversible error.

---

[1]  The District Court did clearly misapprehend certain facts, as discussed in Section V, *infra*, including most importantly that Mercuria "chose to forge ahead" with arbitration in Sweden, JA13501, when it was compelled to arbitrate in Sweden, or not at all.  The District Court's findings of fact are clearly erroneous, which is the appellate standard applicable to factual matters.

**II.**  **Poland Admits the *TermoRio* Standard Governs This Appeal but Misrepresents It**

Poland agrees *TermoRio*'s core rule—that a foreign decision annulling an arbitration award is not entitled to recognition where that decision is "repugnant to fundamental notions of what is decent and just"—applies here. Appellee Br. at 22–23. But Poland then fundamentally mischaracterizes the standard by reducing it to a narrow procedural-fairness test—asserting the repugnancy inquiry focuses exclusively on whether the foreign proceedings were "in some way unfair, infirm, unjust, or bore the hallmarks of a lack of due process." Appellee Br. at 30. That is not what *TermoRio* holds.

Poland points to *TermoRio*'s observation that there was "nothing in the record here indicating that the proceedings before the Consejo de Estado were tainted." 487 F.3d at 935. But *TermoRio* did not hold that procedural unfairness before the annulment court is the *sine qua non* for finding repugnancy. Procedural taint was the focus in *TermoRio* because the award creditors in that case asserted that "the process leading to the nullification decision demonstrated the Colombian government's determination to deny Plaintiffs fair process." *Id.* at 937. But the mere fact that a lack of fair process before the annulment court was at issue in *TermoRio* does not mean that such a lack of fair process is the ***only*** basis on which repugnancy to U.S. public policy can be found. Poland also points to language in *Getma* to try to reinforce the point, but that effort fails for the same reason: The

5

mere fact the party in *Getma* alleged procedural irregularity does not mean that procedural due process in annulment proceedings is the only factor that a court may consider. *See Getma*, 862 F.3d at 50 (Appellant "alleges only that the CCJA's flawed legal analysis, together with other evidence of taint and corruption, justify enforcing the annulled award.").

The better analog is *Pemex*, which expressly applied *TermoRio*'s "repugnant to fundamental notions of what is decent and just" standard, 832 F.3d at 106, and enforced an annulled award based on substantive U.S. public policy concerns that had little, if anything, to do with the procedural hygiene of the Mexican court proceedings through which the award in that case was annulled. Rather, the *Pemex* court focused on the actions taken **before** the annulment proceedings, actions that— as here—effectively rendered the outcome of those proceedings a foregone conclusion. Specifically, the Second Circuit noted the Mexican court's annulment in that case was driven by retroactive legislation designed to undermine the arbitration at issue, and judged that legislation and its effect—not the court proceedings—against U.S. public policies. *Id.* at 107. Notably, the Second Circuit did not find any procedural defect in the Mexican court proceedings; to the contrary, it acknowledged that the Mexican court "appear[red] only to have been implementing the law of Mexico." *Id.* at 111; *see also Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429,

6

460–462 (10th Cir. 2023) (enforcing award notwithstanding set-aside based on U.S. public policy favoring finality, upholding contractual expectations, and policy favoring arbitration).

Poland's attempt to reduce the *TermoRio* test to one of procedural regularity is irreconcilable with *Pemex* and is plainly an improper reading of *TermoRio*. As in *Pemex*, the District Court's task here was to determine whether the ***effect*** of the annulment—taking into account all that went into that annulment, including the CJEU's "interpretation" of the ECT in a manner that is completely contrary to its text and long-understood meaning—offended U.S. public policy.

The District Court's failure to apply this analysis is evident from the face of the decision, and for its part, Poland has endorsed and confirmed the District Court's error by claiming that "repugnancy" is "not coextensive with whether the annulment of an arbitral award conflicts with U.S. public policy." Appellee Br. at 31–32. This is simply not correct. *TermoRio* itself explained that the relevant public policy standard for purposes of determining whether foreign annulment decisions are entitled to comity is whether they are "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." 487 F.3d at 938. There is no other "yardstick" that Mercuria seeks to apply. Appellee Br. at 31. It is Poland—not Mercuria—that has mischaracterized the "repugnancy" standard by improperly attempting to measure it solely against the regularity of the judicial

proceedings that resulted in the annulment, when neither *TermoRio* nor *Pemex* nor any other decision so restricts the U.S. public policy interests at issue. Put another way, Mercuria respectfully submits that where the annulment of an arbitral award retroactively strips a party of contractual rights and denies them any meaningful opportunity for redress, U.S. law does not require a court to extend comity to that annulment decision merely because the court that rendered it did so in a procedurally proper manner.

### III. The *TermoRio* Test, as Applied in *Pemex*, Mandates Reversal

Poland claims *Pemex* is not "controlling in this Circuit" and has been "cabined by subsequent Second Circuit decisions." Appellee Br. at 39. But Mercuria does not argue that *Pemex* is binding Circuit law. *Pemex*, however, carefully applied the *TermoRio* standard by identifying specific U.S. public policy interests that weighed against comity being extended to a foreign set-aside decision. *Pemex* is therefore the leading decision applying *TermoRio*'s repugnancy standard.

*Pemex* is a close factual analog to this case, and application of its policy analysis to this case weighs overwhelmingly against recognition of the Svea Court judgment. Poland cites the Second Circuit's decision in *Esso* to argue for the proposition that *Pemex* is not a "four-factor formula." Appellee Br. at 40 (citing *Esso*, 40 F.4th at 73). *Esso* did not reject the *Pemex* framework, however—it merely observed that the *Pemex* factors are not a mechanical checklist and that considering

8

only those factors would be "too narrow[]" a public policy analysis under the comity standard. *Esso*, 40 F.4th at 74. Indeed, the *Esso* court addressed the *Pemex* factors but found them inapplicable because the Nigerian proceedings there involved no retroactivity, no expropriation, and no denial of forum. *Id*. Here, by contrast, ***all four*** *Pemex* considerations are implicated.

### A. The District Court Erred in Deferring to the Svea Decision Because It Nullified Mercuria's Contractual Right to Arbitrate

The District Court concluded Mercuria did not have a legitimate expectation to be able to arbitrate its dispute with Poland because at the time Mercuria commenced the second arbitration against Poland under the ECT in September 2019 ("**Second ECT Arbitration**"), the CJEU had decided *Slowakische Republik v. Achmea BV*, EU:C:2018:158 (Mar. 6, 2018) and a 2019 Declaration of certain EU member states had been issued. JA1431; Appellee Br. at 41–42. This conclusion by the District Court, while technically accurate, misapprehended the legal significance of each of these events. Poland's arguments—embracing the District Court's finding that Mercuria assumed the risk of annulment when it commenced the arbitration—do nothing to buttress the District Court's analysis.

It is undisputed that *Achmea* was limited to bilateral treaties, not multilateral treaties like the ECT, and that the CJEU's decision in *Achmea* specifically noted that multilateral treaties to which the EU was a member would have to be treated differently. JA1384 (*Achmea* ¶¶ 57–58). Insofar as the District Court concluded

9

that Mercuria's reliance on the right to arbitrate was undermined by *Achmea*, that conclusion ignored *Achmea*'s core holding.

Likewise with respect to the 2019 Declaration. While Poland focuses on the fact that Cyprus, Mercuria's home jurisdiction when the Second ECT Arbitration commenced, joined the 2019 Declaration, it ignores that Sweden, the country that was the seat of arbitration, ***rejected*** that Declaration. JA7360–61. There was, in sum, no credible indication in September 2019 that arbitration under the ECT was incompatible with EU law. Indeed, ***every credible indicator***—including prior state practice and, most obviously, the text of the ECT itself—showed that the state parties to the ECT were bound to arbitrate investment disputes with ***all investors*** with investments under the treaty. JA7349, JA7358, JA7360–61 (Bjorklund ¶¶ 52, 74, 82–85). Were there any doubt of this, ***this Court*** so found in *NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1102 (D.C. Cir. 2024) (petition for *cert.* filed) (explaining the "powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals").[2]

---

[2] The Solicitor General of the United States recently opposed granting *certiorari* in that case, explaining "[e]ven on de novo review, the court of appeals would be likely to conclude that the [ECT] reflects a valid arbitration agreement" because "a state may not invoke 'internal law' to avoid a treaty obligation" and "[g]iven the apparently entrenched standoff" of EU courts towards investment arbitration "it seems unlikely that respondents could get any relief in any forum." United States *Amicus* Br. on *Cert.* at 3, 22, *Kingdom of Spain v. Blasket Renewable Investments LLC*, No. 24-1130 (U.S.).

That the District Court credited Poland's "assumption of risk" narrative without acknowledging this overwhelming evidence of Mercuria's reasonable reliance was clear error.

Poland largely ignores these facts, instead making two irrelevant arguments. First, despite recognizing that U.S law is crystal clear that treaty obligations are a "contract . . . between nations," *see LLC SPC Stileks v. Rep. of Moldova*, 985 F.3d 871, 879 (D.C. Cir. 2021) (quoting *BG Group PLC v. Rep. of Argentina*, 572 U.S. 25, 37 (2014)), Poland invokes *Medellín v. Texas*, 552 U.S. 491 (2008) for the proposition that treaty obligations must be "consistent with the Constitution." Appellee Br. at 43. Poland's *amicus*, the EC, echoes the same argument, suggesting that even if the CJEU's interpretation of the ECT is incorrect as a matter of international law, it must be credited as "the only one that avoids conflict with the EU treaties," analogizing the ECT, an international law treaty, to a statute that should be interpreted consistently with the Constitution. EC Br. at 20. The argument is nonsensical and violative of well-established international law norms of treaty interpretation, as the United States recently opined. United States *Amicus* Br. on *Cert.* at 3, *Kingdom of Spain v. Blasket Renewable Investments LLC*, No. 24-1130 (U.S.) (noting "the Vienna Convention on the Law of Treaties," to which Poland is a party, "provides that, with exceptions not relevant here, a state may not invoke 'internal law' to avoid a treaty obligation"). Even if the EU is free to place its own

11

domestic constitutional principles over its international law obligations, this case is about U.S. law and the enforceability *in the United States* of an arbitral award made under *international law*; there is nothing in U.S. law that requires this Court to subordinate public international law, much less U.S. public policy, to *foreign* domestic constitutional principles.

Poland's second argument, that Mercuria could not have had its expectations frustrated because it is not a party to the ECT and its rights are "derivative," Appellee Br. at 42–43, is a non-sequitur. The entire Investor-State Dispute Settlement ("**ISDS**") system involves derivative rights—investors are never parties to the treaties (which are concluded between states) but are intended and express beneficiaries of them. As the Supreme Court has recognized, arbitration provisions in investment treaties operate as standing offers to arbitrate that are accepted by individual investors; thus, while the treaty is between states, the offer to arbitrate is extended to covered investors as an inducement to invest. *BG Group*, 572 U.S. at 46–47 (Sotomayor, J, concurring). That is how investment arbitration works worldwide, and the FSIA recognizes as much by authorizing enforcement of awards made pursuant to agreements "for the benefit of" private parties. 28 U.S.C. § 1605(a)(6). The fact that Mercuria is "not a party" to the ECT does not entitle the EU to retroactively cancel its contractual right to arbitrate.

**B.** **The District Court Erred in Deferring to the Svea Decision When It Was Based on a Retroactive Application of Law**

Poland argues that "judicial interpretation" is not "retroactive legislation," citing *Rivers v. Roadway Express*, 511 U.S. 298, 312–13 (1994), for the proposition that a judicial construction is "an authoritative statement of what the statute meant before as well as after." Appellee Br. at 44–45. *Rivers* describes the legal fiction that judicial interpretations are deemed to state what the law "always was." *Pemex*, however, properly focused on the ***effect*** of that decision, not the label. 832 F.3d at 108 ("the effect of the ruling amounts to retroactive application of that law"). The Second Circuit expressly held that it was "concerned here with the effect" of the legal change "in these circumstances and upon these parties." *Id.* The "it was always the law" argument, if accepted, would mean that retroactivity concerns could ***never*** arise from a judicial decision—an absurd result that *Rivers* does not compel and that is contrary to elementary notions of fairness.

The basic rule from *Rivers* aside, the record—once again, largely ignored by the District Court—demonstrates that the CJEU's decision in *Republic of Moldova v. Komstroy*, EU:C:2021:655 (Sep. 2, 2021) worked a fundamental change of law. To wit: (a) the ECT was in force since 1998 with no intra-EU carve-out (despite the EU's having unsuccessfully sought one), JA7344, JA7353 (Bjorklund ¶¶ 40, 64); (b) EU member states participated in dozens of ECT arbitrations without raising the intra-EU objection (including Poland's previous arbitration with Mercuria),

13

JA7380–82 (Bjorklund ¶ 145); (c) the CJEU's own Advocate General acknowledged as late as 2016 that the intra-EU objection was essentially unheard of, JA8584–85, (Dashwood, ¶ 43); and (d) no arbitral tribunal had accepted the objection when Mercuria commenced its claim. JA7380–82 (Bjorklund ¶ 145). Whether labeled "interpretation" or "legislation," the effect on Mercuria was identical to what occurred in *Pemex*: A case that was arbitrable when it was filed purportedly became ineligible for arbitration while it was pending. The District Court's refusal to look past the "interpretation" label to the actual effect on Mercuria was legal error.

Mercuria does not dispute the CJEU's authority to interpret EU law ***within the EU***. That is a sovereign prerogative. The question before this Court, however, is whether U.S. courts should endorse the CJEU's "interpretation" by refusing to allow Mercuria to enforce its arbitration award—made under international, not EU law—as a measure of deference or comity to the EU's decisions. A U.S. court does not "second-guess" the CJEU's interpretation of EU law by concluding that the retroactive effect of its ruling on Mercuria is inconsistent with fundamental U.S. notions of fairness, any more than the Second Circuit "second-guessed" the Mexican courts in *Pemex* by enforcing the award notwithstanding a facially valid Mexican court decision. 832 F.3d at 111.

14

### C. The District Court Erred in Deferring to the Svea Decision Because Mercuria's Property Has Been Effectively Expropriated

Poland argues this is not a "classic expropriation or confiscation case" because it involves only "alleged interest accrued on an intercompany loan." Appellee Br. at 45–47. Poland's characterization trivializes an award of PLN 145 million (approximately US$39.8 million) that the Tribunal found was owed to Mercuria as compensation for Poland's internationally unlawful acts. JA295 (Award ¶ 930). Poland's trivializations aside, there is no dispute that Poland used its sovereign power to impose a fine of approximately US$185 million, has refused for over 17 years to return the property that its own courts ordered returned, and now invokes EU law to annul the one adjudicative mechanism that could allow Mercuria to recover the assets that Poland has refused to pay voluntarily.

Poland argues that "it cannot be that each time an arbitral award is annulled, an expropriation is committed." Appellee Br. at 47; *see also* EC Br. at 24–25. This strawman misses the point, which is that here, Poland used its sovereign power to impose the fine, refused to comply with at least six orders of its own courts directing return of the improperly withheld funds, and now invokes, with the EC's active assistance, EU law to annul the one international law remedy through which Mercuria could obtain redress. That sequence—taking property under color of law and then blocking the only meaningful avenue of recovery—constitutes an effective expropriation under U.S. law. *See Pemex*, 832 F.3d at 110 (finding expropriation

where Mexico "frustrated relief" and "consigned [the claimant] to a forum in which relief was foreclosed"). The District Court's refusal to recognize this as an expropriation was clear error.

Poland's attempt to minimize the underlying dispute—describing the fine as having been "reimbursed" (Appellee Br. at 46)—is misleading. While the principal of the fine was returned, Poland refused to pay the full amount that Poland's own courts have ordered repaid at least six times. JA68–77 (Award ¶¶ 199–232).

**D.    The District Court's Finding that Mercuria Has Not Been Left Without a Remedy Is Clearly Erroneous and Contrary to U.S. Law**

Poland and its *amicus* echo the District Court's finding that Mercuria has available for relief, specifically: (1) the Polish courts, (2) a CJEU reference, and (3) the European Court of Human Rights ("**ECtHR**"). Appellee Br. at 47–51; EC Br. at 25–26. Consistent with the United States' recent determination that "it seems unlikely that [intra-EU investors] could get any relief in any European forum," United States *Amicus* Br. on *Cert.* at 22, *Kingdom of Spain v. Blasket Renewable Investments LLC*, No. 24-1130 (U.S.), each is illusory.

**Polish courts.** The Tribunal already found—on full evidence and after hearing—that the Polish courts failed to provide Mercuria with effective redress. JA81, JA295 (Award ¶¶ 247, 930). Six Polish court orders directing return of the funds have gone unenforced, and are unenforceable. JA12803–06 (Kolkowski,

16

¶¶ 5–7). Polish proceedings were "pending" as of a year ago, after 17 years of litigation. JA12806. A "remedy" that has failed for nearly two decades is no remedy at all, and the EC's suggestion that Mercuria "does not explain what steps it took to enforce or execute on them in Poland" is absurd given the record. EC Br. at 26.

Worse still, the District Court substituted its own judgment for the Tribunal's when it decided to treat Polish courts as an "available remedy" notwithstanding the Tribunal's findings that they were not. Under U.S. arbitration law, a court may not revisit merits determinations that parties delegated to an arbitrator, *see Stileks*, 985 F.3d at 878 (explaining "a court possesses no power" to decide questions the parties have assigned to the arbitrator), and Poland has not disputed that the Tribunal's finding that Mercuria has been left without a remedy was a critical and material finding in the Second ECT Arbitration.

**CJEU.** Poland suggests Mercuria could ask the Polish courts to refer questions to the CJEU. Appellee Br. at 48–49. A CJEU reference, however, only addresses interpretation of EU law—it cannot award damages or enforce payment, and would require the cooperation of the Polish courts, who have not seen any reason to make such a reference. Most fundamentally, there is ***no question of EU law at issue*** in this case. JA12806 (Kolkowski ¶ 6).

**ECtHR**. Poland concedes the ECtHR cannot render money judgments. Appellee Br. at 49. At most, it can "direct" Poland to return funds—relief that is

identical in effect to (though likely even less effective than) the six Polish court orders Poland already ignores. JA13021–24 (McCrudden ¶¶ 22, 26–31). Poland has a documented history of non-compliance with both domestic and international court orders, including orders of the ECtHR. JA12785. A declaratory order from the ECtHR is not a meaningful remedy.

### E. U.S. Public Policy Requires Enforcement of the Award

Finally, Poland argues that the U.S. pro-arbitration policy is "beside the point" because the EU's arbitrability rules differ from those of the United States, citing *Getma* for the proposition that a foreign sovereign's "differing policy was not repugnant to our own." Appellee Br. at 50–51; *see also* EC Br. at 31. *Getma* is inapposite. That case involved a Guinean commercial dispute where the arbitration was set aside on procedural grounds based on the arbitrators' fee arrangements. 862 F.3d at 48–49. That is not what is at play here, as this case is not about the conduct of the arbitration. This case involves a multilateral treaty to which the EU itself is a party, where the annulment rests not on the conduct of arbitration, but rather on a retroactive, policy-driven reinterpretation designed to eliminate ***an entire category*** of treaty-based claims after adverse awards totaling billions of dollars against EU member states have been rendered. The U.S. policy favoring arbitration is not a standalone ground for enforcement, but it strongly reinforces the conclusion that the

Svea Decision is not entitled to comity when viewed in conjunction with all of the relevant circumstances of the case. *Grupo Cementos*, 58 F.4th at 461–62.

It bears repeating that, but for the Svea Decision, there is virtually no question this award would be recognized here. As this Court has found, Article 26 of the ECT provides written, unconditional consent to arbitrate. *NextEra*, 112 F.4th at 1102. District courts in this Circuit have recognized virtually identical ECT awards. *See Cube Infrastructure SICAV v. Kingdom of Spain*, No. 20-1708, 2025 WL 2374517 (D.D.C. Aug. 14, 2025); *Blasket Renewable Invs. LLC v. Kingdom of Spain*, No. 20-1081, 2025 WL 3516146 (D.D.C. Sept. 11, 2025).[3]

The District Court stated that it "squint[ed] in vain" to find parallels to *Pemex*. JA13497–98. Mercuria respectfully submits, however, that the public policy considerations underlying the *Pemex* decision are manifest in this case, and when they are applied properly, it is clear that the District Court erred by failing to take proper sight of them.

## IV. Poland's "Comity at Its Zenith" Argument Is Meritless

Poland embraces the District Court's finding that comity is at its "zenith" in this case because the United States has no direct interest in the underlying EU-law

---

[3] Poland effectively concedes that the District Court's reasoning based on "protectionist undertones" was improper. Nothing in *Pemex*, *TermoRio*, or any other case suggests that a finding of "protectionism" is a prerequisite to enforcing an award notwithstanding a foreign set-aside. *Pemex*, 832 F.3d at 106–12. Accordingly, the District Court's reliance on this reasoning was legal error.

dispute.  (Appellee Br. at 36–37; *see also* JA13494–95 (citing *NextEra*, 112 F.4th at 1109–10).  That quote, however, came from the portion of *NextEra* addressing the propriety of an anti-suit injunction—it had nothing to do with whether a court owes deference to a foreign court's annulment decision under Article V(1)(e) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("**New York Convention**"), 21 U.S.T. 2517, 339 U.N.T.S. 28 (opened for signature June 10, 1958), which is a very different situation governed accordingly by different legal standards.  The District Court's reliance on this passage, JA13494–95, was similarly misplaced.

In the anti-suit injunction context, the question is whether the United States' interests justify the extraordinary remedy of preventing another sovereign's courts from hearing and ruling in a case that is properly before it.  *E.g., Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926–27 (D.C. Cir. 1984).  Enjoining a litigant from proceeding before a foreign court is an extraordinarily invasive remedy and one that concededly trespasses (albeit, at times justifiably) on that court's sovereignty.  *Id.*  By contrast, the question of whether to defer to another court's set-aside of a foreign arbitral award contemplates no such intrusion on a foreign court's jurisdiction or sovereign prerogative; refusal to recognize the Svea Court judgment would have no impact on the Award's enforceability in Europe.  Indeed, under the District Court's and Poland's view, the U.S. courts would forfeit

20

their own authority and sovereignty under the New York Convention by shrinking into the role of procedural referees and genuflecting to a foreign court's block of a validly-made award. That is much more than comity demands.

In any event, the United States clearly *does* have a direct interest in this case. As a signatory to the New York Convention, the United States has a treaty obligation with respect to the enforcement of international arbitral awards, regardless of whether it is a party to the ECT. The Convention's strong pro-enforcement mandate and the "emphatic federal policy in favor of arbitral dispute resolution" are interests of the United States. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). The District Court's characterization of this case as a purely "internal" EU matter therefore ignores the United States' own treaty commitments and the fundamental U.S. interest in ensuring that sovereigns honor their arbitration agreements.

In short, if, as Poland seems to suggest, comity meant that a secondary jurisdiction court could never refuse recognition of a set-aside decision involving foreign litigants and foreign law, Article V(1)(e)'s discretionary language ("may") would be meaningless. As this Court explained in *TermoRio*, the New York Convention's use of "may" rather than "shall" was deliberate—it preserves judicial discretion to withhold deference when warranted. 487 F.3d at 938–39. Likewise, the Supreme Court has held that comity is "neither a matter of absolute obligation,

21

on the one hand, nor of mere courtesy and good will, upon the other." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895). The District Court below treated comity as a near-absolute obligation and relied on the comity considerations applicable to anti-suit injunctions, and accordingly its decision was erroneous and must be reversed.

## V. Poland Misstates the Record Repeatedly

Poland consistently misstates and misrepresents the record. Mercuria is compelled to address briefly some of the most glaring misrepresentations in Poland's brief.

### A. The First ECT Arbitration

Poland barely mentions its previous arbitration with Mercuria ("**First ECT Arbitration**"). Appellee Br. at 14. It fails to note that Poland appeared and fully participated, never once claiming that EU law prohibited the arbitration or that no valid agreement to arbitrate existed. JA7111–20. This conduct was consistent with the settled understanding at the time: EU Member States, including Poland, considered ECT Article 26 to represent a binding consent to arbitrate, including with EU investors. Poland's silence on this point speaks volumes and fully undermines Poland's current argument that its, and the EC's, disavowal of ECT Article 26 was not a retroactive *volte-face*. In sum, Poland's acceptance of the award in the First ECT Arbitration underscores and bolsters Mercuria's argument that the CJEU's decision worked—and the Svea Decision implemented—a retroactive change in law.

**B.      Poland Misrepresents the Facts Concerning Sweden as a Venue**

Poland's brief repeatedly emphasizes that Mercuria "voluntarily chose" to arbitrate before the Arbitration Institute of the Stockholm Chamber of Commerce ("**SCC**") with Stockholm as the seat.  Appellee Br. at 15–16, 27–28.  This is badly misleading.  Presumably, Poland misrepresents the record in this way because it echoes the District Court's conclusion—itself contradicted by the undisputed record evidence—that "the company had advanced notice that its arbitration efforts were likely to collapse in the face of CJEU precedent, yet it chose to forge ahead anyway." JA13501.  In reality, Mercuria attempted to seat the arbitration outside the EU, but Poland—at that time not yet a member of the International Centre for Settlement of Investment Disputes—refused to participate.  JA7104 (Kolkowski ¶ 7).  Having been unsuccessful in compelling Poland's compliance with decisions of Poland's own courts for more than 8 years at that point, and left with no alternative, Mercuria acceded to an EU-seated SCC arbitration because, otherwise, there could be no arbitration at all.[4]

---

[4]   While the EU's hostility toward intra-EU treaty arbitrations was becoming clear by the time Mercuria commenced the Second Arbitration—leading Mercuria to seek a non-EU seat—Mercuria underscores that, at the time it commenced that arbitration, there was no legal impediment to its doing so, since *Achmea* did not apply to arbitrations under multilateral treaties, and *Komstroy* had not yet been decided.  *See supra* Part III.A; *infra* Part V.C.

Poland's tactical insistence on an EU seat, something it never acknowledges, but also did not deny before the District Court, is itself evidence of bad faith and vitiates any argument that Mercuria "assumed the risk." Neither the SCC (which has since refused to seat intra-EU arbitrations inside the EU) nor Mercuria suspected that EU law would be "interpreted" to retroactively nullify the unconditional consent to arbitration in the ECT when the EU itself was a signatory to the ECT. The District Court's treatment of these facts was clearly erroneous.

### C. Poland's "Eyes Wide Open" Narrative, Accepted by the District Court, Is Clearly Contradicted by the Record

Poland, again echoing the District Court's erroneous conclusion, claims Mercuria initiated the Second ECT Arbitration with "eyes wide-open" after *Achmea* and the 2019 Declaration. Appellee Br. at 2, 13–14, 41–42. But the uncontradicted record shows otherwise. When Mercuria commenced the Second ECT Arbitration in September 2019, *Achmea* had been decided, but that decision addressed only **bilateral** investment treaties, not **multilateral** treaties like the ECT. Poland's (and its *amicus*') claim that *Achmea* "unambiguously held that intra-EU investment arbitration was unlawful under EU law" is blatantly incorrect. Appellee Br. at 2; *see also* EC Br. at 15–16. It was *Komstroy* that purported to unexpectedly extend *Achmea*'s rationale to multilateral treaties like the ECT; *Komstroy,* however, had not been decided in September 2019 when Mercuria initiated the Second ECT Arbitration. Indeed, in April 2019 the CJEU ruled that a different multilateral ISDS

24

mechanism *was compatible with EU law* notwithstanding that it permitted the adjudication of EU law claims in a manner that bypassed the CJEU. JA2489–90 (CJEU EU-Canada-CETA Opinion). There is quite simply *nothing* in the record of this case to suggest that at the time Mercuria commenced the Second ECT Arbitration, there was a legal impediment to its doing so.

Further, while Poland points to the January 2019 declaration signed by Cyprus asserting that intra-EU arbitration under multilateral treaties might be considered unlawful, Appellee Br. at 43, it neglects to mention that (a) Sweden, the primary jurisdiction for the Second ECT Arbitration, *rejected that declaration*, and (b), as even the District Court acknowledged, the 2019 declaration was merely predictive. JA13498. A prediction is not a prohibition, and the District Court's decision to hold Mercuria responsible for not heeding it—particularly when it was rejected by Sweden and contradicted by the CJEU's Opinion on EU-Canada-CETA (as well as the plain text of the ECT and basic principles of international law)—was error. This Court confirmed as much in *NextEra*, finding "*powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals*." 112 F.4th at 1102 (emphasis added). The District Court's reliance on the non-binding declaration to suggest that Mercuria acted recklessly cannot be squared with these facts and circumstances, which quite properly indicated to Mercuria that it had a legal right to commence the arbitration at issue here.

25

**CONCLUSION**

EU member states and the EC have clearly had buyer's remorse over the ECT, which has resulted in multiple large awards against those member states. The ECT allows signatory states to withdraw from the treaty, and if Poland and/or the EU concluded that the ECT was unfavorable—because Article 26 violated the EU treaties or otherwise—the proper path forward would be for them to withdraw from the ECT in accordance with Article 47, which they have now in fact done.

Article 47, however, protects investors by providing that after a Contracting Party officially withdraws from the ECT, the treaty's protections will continue to apply to qualifying investments made prior to the withdrawal's effective date for an additional period of 20 years. JA7344–45, JA8620. This sunset clause serves the key function of protecting investors from getting caught in midstream policy changes decided unilaterally by ECT Contracting Parties.[5]

Article 47 is not relevant to this case, but it does highlight Poland's and the EC's gambit. Rather than wait 20 years, the EC and its EU member states sought to "interpret" their way out of ECT liabilities. The interpretation that Poland and the

---

[5]   Poland exited the treaty in December 2023, but Poland's undeniable signature on the ECT in July 2001 binds it to the sunset clause, which Poland, unsurprisingly, has refused to acknowledge or even mention as it tries to shirk off its international law obligations as quickly as possible.

EC have urged on the District Court and this Court, however, is completely unconvincing and cynical.

The District Court, in the pursuit of comity, failed to take sight of the circumstances surrounding this case or the effect of the foreign court decision it deferred to. U.S. law did not dictate that path—the District Court made a choice. But it applied the wrong assumptions and misread the law that governs that choice. The Svea Decision, and the CJEU decisions on which it was based, are fundamentally inconsistent with well-established public policies of the United States. Those decisions do not deserve this Court's seal of approval, and Mercuria does not deserve to be shut out of its right to recognition of its award in the United States.

For the foregoing reasons, this Court should reverse the decision of the District Court.

Dated: May 28, 2026

Respectfully submitted,

*/s/ James E. Berger*

James E. Berger (D.C. Bar No. 481408)
Charlene Sun (D.C. Bar No. 1027854)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212-335-4500
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com

*Counsel for Petitioner-Appellant*
*Mercuria Energy Group Limited*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 6,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1); and

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally-spaced serif typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ James E. Berger*
James E. Berger
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212-335-4500
james.berger@us.dlapiper.com

*Counsel for Petitioner-*
*Appellant Mercuria Energy*
*Group Limited*

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(b) and Circuit Rule 25(f), I hereby certify that on May 28, 2026, I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and the CM/ECF system will accomplish service.

/s/ James E. Berger
James E. Berger
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212-335-4500
james.berger@us.dlapiper.com

*Counsel for Petitioner-Appellant Mercuria Energy Group Limited*